IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

THOMAS HEIN,                                :
                                            :
        Plaintiff,                          :
                                            :
v.                                          :        CIVIL ACTION NO.
                                            :        2:16-CV-00081-RWS-JCF
IMS GEAR HOLDING, INC., et al.,             :
                                            :
        Defendants.                         :

## <u>NON-FINAL REPORT AND RECOMMENDATION</u>

This case is before the Court on Plaintiff's Motion For Partial Summary Judgment (Docs. 67, 68, 77) and Defendants' Motion For Summary Judgment (Doc. 66).  For the reasons discussed below, it is **RECOMMENDED** that Plaintiff's motion be **GRANTED in part** and **DENIED in part**.  It is further **RECOMMENDED** that Defendants' motion be **GRANTED in part** and **DENIED in part**.

## <u>PROCEDURAL HISTORY</u>

Plaintiff, who worked for IMS Gear Holding, Inc. as an accountant, filed a Complaint on April 27, 2016 (Doc. 1).  On May 20, 2016, Plaintiff filed an Amended Complaint (Doc. 2 ("Am. Compl.")), which alleges that Defendants:  (1) interfered with his ability to take medical leave under the Family Medical Leave Act ("FMLA") (Count I); (2) retaliated against him for taking FMLA leave (Count

II); (3) failed to accommodate his disability in violation of the Americans with Disabilities Act ("ADA") (Count III); (4) retaliated against him in violation of the ADA (Count IV); (5) unlawfully discharged him under the ADA (Count V); (6) failed to provide him with benefits information and provide him with COBRA notification under the Employee Retirement Income Security Act ("ERISA") (Count VI); (7) interfered with his rights to receive benefits under ERISA (Count VII); (8) breached their contract with him (Count VIII); and (7) "acted in bad faith and have been stubbornly litigious," entitling Plaintiff to attorney's fees and costs under O.C.G.A. § 13-6-11 (Count IX).  (*See generally id.* at ¶¶ 59-233).  All Defendants jointly answered the Amended Complaint on July 18, 2016 (Doc. 8), and discovery proceeded.  On May 3, 2017, Plaintiff moved to amend the Amended Complaint by deleting his breach of contract claim (Count VIII).  (Doc. 63).  The undersigned granted that motion on May 5, 2017.  (Doc. 64).

On May 12, 2017, Plaintiff moved for partial summary judgment.  (Docs. 67, 68, 77).  Defendants responded to that motion (Docs. 69-70, 78), and Plaintiff has replied (Doc. 73).  On the same day, Defendants moved for summary judgment on all Plaintiff's claims (Doc. 66), to which Plaintiff has responded (Doc. 71), and Defendants have replied (Docs. 72, 75).  Briefing is therefore complete, and the undersigned now turns to the merits of the parties' summary judgment motions.

# FACTS FOR SUMMARY JUDGMENT PURPOSES[1]

The facts, for summary judgment purposes only, are derived from Plaintiff's Corrected Statement Of Material Facts As To Which There Is No Genuine Dispute (Doc. 77 ("Pl. SMF")); Defendants' Statement Of Undisputed Material Facts (Doc. 66-2 ("Def. SMF")); Defendants' responses to Plaintiff's statement of material facts (Doc. 69); Plaintiff's Statement Of Additional Material Facts (Doc. 71-1); Plaintiff's responses to Defendants' statement of facts (Doc. 71-3); Plaintiff's response to Defendants' statement of additional material facts (Doc. 73-1); Defendants' responses to Plaintiff's corrected statement of facts (Doc. 78); and uncontroverted record evidence. Many of these facts are taken from the depositions of Plaintiff (Doc. 68-13 ("Hein Dep.")), Timothy Corbin (Doc. 68-8 ("Corbin Dep.")), and Dustin Chambers (Doc. 68-3 ("Chambers Dep.")), as well as affidavits and declarations provided by the parties and exhibits thereto. (*See* Docs. 66-3 through 66-13; Docs. 67-3 through 67-21; Docs. 68-1 through 68-15). The undersigned has reviewed the record, including the parties' filings, to determine whether genuine issues of material fact exist to be tried. Yet the court need not "scour the record" to make that determination. *Tomasini v. Mt. Sinai Med. Ctr. Of Fla.*, 315 F. Supp. 2d. 1252, 1260 n.11 (S.D. Fla. 2004) (internal quotation omitted). The facts are construed in the light most favorable to Plaintiff as the

---

[1] Where relevant, additional facts are addressed in the Discussion section.

non-movant.  *See Frederick v. Sprint/United Mgmt. Co.*, 26 F.3d 1305, 1309 (11th Cir. 2001).

## I.   __Plaintiff's Employment With IMS Gear Holding, Inc.__

Plaintiff began working for IMS Gear Holding, Inc. on May 20, 2014.  (Def. SMF at ¶ 1; Hein Dep. at 31:23).[2]  He was interviewed and hired by Timothy Corbin, (Hein Dep. at 18:22-25), who is the Finance Director for IMS Gear Holding, Inc. and Plaintiff's direct supervisor.  (Pl. SMF. at ¶ 13; Def. SMF at ¶ 12; Hein Dep. at 26:21-24).   Plaintiff also reported to the Gainesville location President, Gregory Vitek, and the Virginia Beach location President, Weissenthal.  (Pl. SMF at ¶ 19).   When he began his employment, Plaintiff's job title was "Assistant Finance Director."  (Def. SMF at ¶ 4).  At Corbin's request, Plaintiff's title was later changed to "Senior Accountant."  (*Id.*; Hein Dep. at 55:4-8).  Corbin referred to the change as a "demotion" related to Plaintiff's "poor job performance."  (*See* Doc. 66-13 at ¶ 10).  Plaintiff maintains that it was not a demotion, but instead was precipitated by Corbin's desire to ease internal tension in the department.  (*See* Hein Dep. at 56:6-25, 57:25-58:3).  Plaintiff also testified that the title change was only internal and did not change with regard to external entities who dealt with the department.  (*Id.* at 55:6-8; Doc. 71-3 at ¶ 4).

---

[2] When referring to the parties' depositions, the undersigned utilizes the original pagination, as opposed the CM/ECF pagination.

## II.   <u>Plaintiff's Medical Condition</u>

In 2009, Plaintiff was diagnosed with ulcerative colitis.  (Pl. SMF at ¶ 56).

Individuals with ulcerative colitis often have frequent bowel movements along

with abdominal pain, diarrhea, bloating, rectal bleeding, fatigue, and recurring

episodes of colon inflammation.  (*Id.* at ¶¶ 57-58).  When Plaintiff suffers an

inflammatory episode caused by his condition, his abilities to leave the house,

perform work, and concentrate are reduced.  (*Id.* at ¶¶ 63-65).  Plaintiff maintains

strict dietary restrictions due to his condition.  (*Id.* at ¶ 59).

## III.   <u>Plaintiff's Job Performance</u>

Around September 2014, Plaintiff met with Corbin to discuss his 90-day

review, on which Defendants maintain Plaintiff had received a below average

rating.  (Def. SMF at ¶ 18).  Corbin expressed concern over Plaintiff's attendance,

including absences, a sick day, late arrivals, early and on-time departures, and

frequent absences from his workspace. (Corbin Dep. at 65:2-5; Hein Dep. at 44:7-

14).  Plaintiff testified that some of his attendance issues were related to his

medical condition, while others were due to picking up his son from school.  (*Id.* at

45:5-7).  Plaintiff also testified that during his employment interview, he had

spoken with Corbin about his need to "leave right on time" to pick his son up from

school.  (*Id.*, 44:25-45:4).

At an annual evaluation in mid-2015, Corbin again expressed concern about Plaintiff's attendance, citing the continuance of his late arrivals to work.  (Hein Dep. at 54:4-12).  Plaintiff again attributed some of the late arrivals to dropping off his children at school.  (*Id.* at 53:24-54:3; Doc. 71-3 at ¶¶ 16-17).  A form titled "Employee Performance Review" and indicating "Annual Review" contains self-evaluation ratings and comments completed by Plaintiff.[3]  (Doc. 71-2 at 25-33).  On that form, Plaintiff rated himself as 4 or 5 in each evaluation area except for "attendance," for which he rated himself at a 3, noting that "Attendance (late arrivals) have been an issue in the last three month [sic] due to family commitments.  However, my wife and I have taken measures (school change for oldest son) to assure timely arrivals in the near future."  (*Id.* at 30).  Additionally, Plaintiff conceded that it "took me several month [sic] to get comfortable with the

---

[3] In his deposition, Plaintiff referenced this form and asserted that both he and Corbin completed it.  (Hein Dep., 53:1-10).  Plaintiff attaches a copy of the form with his own evaluation to his response to Defendants' motion for summary judgment, but that form does not include any evaluations completed by Corbin. (S*ee* Doc. 71-2 at 25-33).  Defendants attached a copy of the review form completed by both Hein and Corbin to their motion for summary judgment.  (*See* Doc. 66-4).  However, in his responses to Defendants' statement of material facts, Plaintiff objects to Defendants' attached form on grounds that it "is hearsay, has not been authenticated by Defendants, has text cut-off or omitted, is missing the performance criteria key that was attached to Plaintiff's evaluation, and is not signed by Plaintiff."  (Doc. 71-3, ¶ 19).  Defendants do not attempt to refute this objection on reply.  Accordingly, consistent with this Court's local rules, the undersigned does not consider Defendants' attached evaluation form in support of their motion for summary judgment.  *See* LR 56.1B(2)(a)(2), NDGa. ("This Court will deem each of the movant's facts as admitted unless the respondent . . . states a valid objection to the admissibility of the movant's fact[.]").

existing ERP system," "some reports were faulty," and "I am not able to multi task." (*Id.* at 25-27, 30).  On October 15, 2015, Plaintiff sent Corbin an email in which he advised Corbin of his intention to go to Germany in December 2015- January 2016, which required him to miss "SAP implementation in Virginia Beach." (Doc. 71-2 at 47).  According to Plaintiff, Corbin advised Plaintiff that his annual review was high enough for him to receive his full bonus for 2015.  (Doc. 71-2 at ¶ 22).

In November 2015, Corbin assigned Plaintiff tasks before leaving for his own vacation, which included daily bank reconciliations, health insurance calculations related to Defendants' transition to a self-insurer program, a balance sheet analysis for Gregory Vitek, and a lease reconciliation.  (Hein Dep. at 73:12- 22).  Plaintiff testified that from his point of view, he had completed the three required assignments, and that Corbin pushed the deadline for the lease reconciliation assignment to another date.  (*Id.* at 75:11-14, 76:4-6).  Corbin testified that these tasks were not performed as required.  (*Id.* at 72:24-73).

Plaintiff's core responsibilities included "supporting multiple manufacturing entities."  (Doc. 68-9 at 4).  In his employment offer, Plaintiff was informed that "the Company can require that the Employee perform duties in the Company other than those specifically defined in the related documents and that these duties maybe [sic] local or in support of another location of the Company without the

7

requirement of dissolution and reestablishment of this employment agreement." (*Id.* at 6).  Corbin testified that Plaintiff was directed to travel to Virginia at least four times during his employment and yet never traveled there, giving "many reasons" for failing to do so.  (Def. SMF at ¶¶ 34-35; Corbin Dep. at 181:21-182:5).  Aside from two documented occasions, Corbin could not recall details about the other times he maintains he had directed Plaintiff to go to Virginia.  (*Id.* at 182:1-9).  On November 15, 2015, Corbin sent an email to Plaintiff and another accountant, Lindsey Patino, exploring the possibility of both accountants being able to join Corbin for a trip to Virginia Beach departing on November 30 to support the IMS office there.  (Doc. 71-2 at 59; *see also* Hein Dep. at 78:5-79:17).  Plaintiff responded by email that he was planning a vacation for that time period, apologized for not putting his vacation on the calendar, and requested to go a day later than Corbin first suggested on December 1.  (Doc. 71-2 at 59).  Corbin then directed Patino to join him on November 30 with Plaintiff joining them by departing on December 1.  (*Id.*).  Plaintiff replied by email, "Sounds good."  (*Id.* at 58).  Later that night, Plaintiff stated that he would not be able to come on the trip because "My wife is currently on medical leave and can neither (fully) take care of herself or the kids.  Our nanny and substitute nanny are not available for the day in question."  (*Id.*).  Plaintiff noted that he could travel to Virginia Beach "another

day later the [sic] month when my wife is doing better and assistance is available."

(*Id.*).  The next day, in response to Plaintiff's email, Corbin wrote the following:

> Thomas
> Later will not work.  We will forego it then.  Somehow, we have to
> find some more flexibility from you in the future with regards to these
> sort [sic] of travel.  I don't ask for it often.  My purpose for you this
> trip was to support the y[ear] e[nd] physical inventory also in va.

(*Id.*).  Plaintiff did not attribute any of the other instances of missed overnight travel to either his or his family's health.  (Hein Dep. at 87:21-25).

With regard to Plaintiff's performance on the health insurance team in November 2015, Corbin testified that Plaintiff had not achieved a successful outcome as a part of that team.  (Corbin Dep. at 207:17-19).  Corbin also testified that he had not approved Plaintiff's efforts at seeking a health insurance broker license.  (*Id.* at 207:23-24).  Plaintiff maintained that he was not aware he needed Corbin's approval to obtain the license and studied nights and weekends in order to fulfill the licensure requirements.  (Doc. 71-2 at ¶¶ 55-56).  According to Corbin, Plaintiff was eventually removed from the team.   (Corbin Dep. at 212:6). According to Plaintiff, he received positive feedback from Corbin and Vitek regarding his work on the health insurance team.  (*Id.* at ¶ 79).

## IV.   Year-End Closing Tasks And Plaintiff's Illness

On Thursday, January 14, 2016, Plaintiff ate sushi for lunch with some coworkers.  (Hein Dep. at 95:15-16).  After a few hours, he began to feel sick but

completed his workday.  (*Id.* at 95:23).  The next day, Friday, January 15, Plaintiff came in to work and planned to go out to eat again with coworkers, but later changed his mind because he "had diarrhea the whole day."  (*Id.* at 96:4-7).  On Saturday, January 16, 2016, Corbin sent an email notifying the accounting team of tasks that needed to be completed "by end of Monday[,]" which included tasks specifically assigned to Plaintiff.  (Def. SMF ¶ 50; Hein Dep. at 99:24-100:10). Plaintiff began attempting to complete these tasks on Sunday despite feeling "very, very sick[.]"  (*Id.* at 100:21-22).  On Sunday afternoon, Plaintiff sent Corbin an email stating the following:

> I have reconciled inter company over the weekend and closed AR and AP in all companies.
>
> However, I will not be able to come into work tomorrow morning.  I am still suffering from my upset stomach and have lost too much fluids the last days.  I will be working from home tomorrow until all year end tasks are competed and will be heading out to the urgent care in Suwanee later that day for medication and infusion.
>
> I will be in touch tomorrow.

(Doc. 67-5 at 1; *see also* Hein Dep. at 101:10-22).  Ten minutes later, Plaintiff sent the following email to the accounting team, which included Corbin:

> Please find attached the most current cash pooling and inter company reconciliation for December 2015.
>
> Furthermore, I have closed AR and AP in all SAP entities.  Please contact me in case you have to make any additional entries.

> I will be working from home tomorrow morning until we closed [sic]
> the year 2015 and head out to see a doctor afterwards. I am still
> suffering from my upset stomach last week.

(Doc. 67-6 at 1). Teal responded to Plaintiff's email, stating "Jesus, do I need to

go to work????? If I need to I will call and change all my appointments." (*Id.*).

Teal also asked Plaintiff to reopen an entity to make additional entries. (Hein Dep.

at 102:4-10).

On Monday, January 18, Plaintiff continued working remotely from home

on year-end tasks and had not yet been to the doctor. (Def. SMF at ¶ 53; Hein

Dep. at 102:11-25). Plaintiff testified that he wanted to go to the doctor, but felt

that he needed to wait until his team did their bookings, so that he could "rematch

accounts payable and reconcile accounts again and that I can do the tax entry[.]"

(Hein Dep. at 102:15-16). On Monday afternoon, Plaintiff sent Corbin an email

noting that "Tax provisions have been booked. Period 12 is closed in SAP. Please

proceed with the review at your earliest convenience." (Doc. 68-9 at 27-28). Later

that afternoon, Corbin sent two emails addressed to Plaintiff with the rest of the

accounting team copied. (*See id.* at 26-27). Both emails included entries that

requiring completion. (*Id.*). Shortly thereafter, Corbin directed Teal to check his

entries, which she did. (*Id.* at 25-26).

At approximately 5:30 p.m., Corbin sent an email to Plaintiff with

instructions on correcting entries Plaintiff had made earlier. (*See* Doc. 68-9 at 20).

11

About an hour later, Plaintiff replied with a request for clarification.  (*See id.*).

Corbin responded with further instructions regarding his previous email.  (*See id.*

at 19-20).  At approximately 6:30 p.m. on Monday evening, Corbin sent an email

to the entire accounting team communicating the following:

> Only two things remain in finalizing our closing:
>     1. Verification of calculation . . .
>     2. An entry to properly show external interest expense in
>     company 2000 from Thomas Hein.  See attached email.
>
> Then, we are all done as far as I am concerned.
>
> @Thomas or Mandy—Once these points are cleared.  Please notify all
> who are in on this e-mail that we are done.
>
> Thank you.

(Doc. 67-8 at 2).  At 11:51 p.m. on Monday night, Plaintiff sent an email to Corbin

informing him that he had calculated some bookings, and that he had corrected an

incorrect entry he made earlier.  (*See id.* at 19).

At around 8:30 a.m. on the following day, Plaintiff sent an email to the

entire team, which stated:  "Dear All, I am on my way to the doctor.  I will do the

tax entry when back.  @ Tim: Please let me know if I re-allocated the interest

expenses correctly."  (*Id.* at 17).  At approximately noon that day, Corbin sent

Plaintiff an email stating the following:

> Thomas,
>
> There is no external interest expense in company 2500.  Please undo
> any entry that you did in company 2500 or 2100 last night.  At this

point, you are really prolonging the YE closing.  Please simply follow
my instructions in the e-mail that I sent to you attached.  Your only
entry will be in company code 2000.

You are mixing up the concept of inter-company interest on money
loaned from the Holding company to companies Georgia Inc. and
Braking Inc. . . . with external interest expense.  Please following [sic]
the instructions in the e-mail that I sent yesterday.  Undo any entries
that you did last night.  And make the one entry in 2000[.]

Then make your tax provisions

Then notify controlling that we are closed.  Please then notify the rest
of the team also.  I do not want to come into the office tomorrow and
have unresolved 2015 entries.  The interest classification is the only
thing that we are missing.

This must be done today.

(*Id.* at 23).  In an email around 2:30 p.m. the same day, Plaintiff responded, stating

I have to apologize that I did not understand your instructions
correctly. . . . I have been very sick the last few days.  I have lost over
12 pounds of body weight the last six days and eventually been put on
several medications.  I am dizzy and it is hard for me to concentrate.  I
really tried hard the last two days to contribute as good as possible.  I
am very sorry for the inconvenience.

I would be pleased if you can correct my wrong bookings together
with Mandy.  I spoke with her this morning.

The doctor said I should not go to work for the remainder of this week
(doctors notice).  I will be back in the office on Monday.

(*Id.* at 23).  That evening, Corbin forwarded Plaintiff's email to Chambers, stating

"Need your help with the communication below.  Can we meet tomorrow or

Thrusday[?]"  (Doc. 67-7 at 1).  Plaintiff testified that Corbin never acknowledged

that he was sick.  (Hein Dep. at 112:5-7).  For the remainder of the week, Plaintiff stayed in bed, limiting his work to checking and forwarding emails.  (*Id.* at 113:2-13).

## VI.  **Plaintiff's Termination**

In December 2015, Corbin and Chambers began discussing the possibility of terminating Plaintiff's employment due to performance issues.  (Def. SMF at ¶ 30; Doc. 66-14 (Chambers Dep. at 65:10, 71:24-72:1).   Chambers testified that Corbin's discussions with him in December raised performance issues with regard to Plaintiff including

> some level of how Mr. Hein's performance with the stop loss and partial self-insurance meetings had went.   That revolved around different aspects of day-to-day functions and duties not being completed by Mr. Hein as well, were some of the subject matters that I remember right offhand
> . . .
> The failure to complete job duties and expectations or revolving around that caliber were all surfaced during that meeting[.]

(Chambers Dep. at 85:1-7).

On January 19, 2016, Corbin emailed Chambers with regard to Plaintiff, seeking to consult Chambers about Corbin's "frustration with performance-based issues . . . accumulating to just a critical point in my mind."   (Corbin Dep. at 146:14-147:1; *see also* Doc. 67-7 at 1).  When he returned to work on January 25, 2016, Plaintiff spoke with Corbin about his sickness the prior week and noted his belief that his flare-up had been due to eating bad sushi.  (Corbin Dep. 162:6-14).

The next day, Plaintiff met with Corbin and Chambers to discuss issues with Plaintiff's performance.   (*Id.* at 169:18-21).   Corbin testified that Plaintiff's absence was not discussed at that meeting, (*id.* at 172:10-23), whereas Plaintiff testified that Corbin criticized him "for being out the entire prior week." (Hein Dep. at 117:25-118:1).   Corbin also expressed concern over Plaintiff's audit preparations the prior week, his inability to travel to Virginia Beach in early December, and his failure to perform the assigned tasks in November during Corbin's vacation.   (*Id.* at 118:2-8). At a second meeting with Chambers and Corbin on the following day, Plaintiff was notified of his termination of employment.   (*Id.* at 120:11-14).   Plaintiff was also informed that his health insurance coverage would end the following day.   (*Id.* at 121:14-15).   Plaintiff was not informed of the opportunity to continue his health coverage through COBRA in the meeting.   (*Id.* at 121:10-122:1).   After his termination, Plaintiff initiated no further communication with regard to his health coverage.   (*Id.* at 122:4-124:7).

## VII.   Post-Termination Facts Regarding COBRA Notice

After finding out that he was terminated, Plaintiff was concerned about staying on Defendants' health plan because he "was still sick[,]" and required to follow-up care concerning his colitis with his gastroenterologist.   (*See* Hein Dep. at 120:21-121:15).   He relayed this concern to Chambers and Corbin during his termination meeting, but Chambers informed him that the day of his termination

15

would be the last day of his health insurance coverage. (*Id.* at 121:8-15). However, Defendants' policy provides that "an employee may be eligible for 18 to 36 months continued group health insurance benefits if he is involuntarily terminated for reasons other than gross misconduct." (Chambers Dep. at 76:18-22). Chambers testified that Plaintiff had not been terminated due to gross misconduct. (*Id.* at 76:23-25). However, Plaintiff states that he did not receive his COBRA election notice from Defendants so as to continue his coverage. (Doc. 71 at 8).

At the time of Plaintiff's termination, Defendants had contracted with a third-party benefits company called Discovery Benefits, who was responsible for mailing out notices of eligibility for continuing coverage under COBRA. (Chambers Dep. at 77:5-7). Chambers testified that Nicole Shriver was normally responsible for notifying Discovery Benefits of a termination so that a COBRA notice could be sent to the former employee. (*Id.* at 77:8-10). He also testified that this process was initiated through access to a portal provided by Discovery Benefits, to which he, Shriver, and an additional HR employee had password-protected access. (*Id.* at 77:11-78:4).

The undersigned now turns to the merits of Plaintiff's and Defendants' motions for summary judgment.

## DISCUSSION

## I.   Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by[] . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1).   The moving party has an initial burden of informing the court of the basis for the motion and showing that there is no genuine issue of material fact. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986); *see also Arnold v. Litton Loan Servicing*, *LP*, No. 1:08-cv-2623-WSD, 2009 U.S. Dist. LEXIS 119787, at *10 (N.D. Ga. Dec. 23, 2009) ("The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.") (citing *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999)).   If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, she must respond by going beyond the pleadings, and by her own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine

issue for trial.  *See Celotex*, 477 U.S. at 322, 324.  "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.' "  *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1186-87 (11th Cir. 2011) (quoting *Celotex*, 477 U.S. at 322).

Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991), *cert. denied*, 506 U.S. 952 (1992*); see also* FED. R. CIV. P. 56(c)(1)(B), (c)(4).  The evidence "cannot consist of conclusory allegations or legal conclusions." *Avirgan*, 932 F.2d at 1577.  Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. *See Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714 (11th Cir. 1984).

For a dispute about a material fact to be "genuine," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).  It is not the court's function at

the summary judgment stage to determine credibility or decide the truth of the matter. *Id.* at 249, 255. Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255.

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014). And "the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist." *Glenn v. Brumby*, 724 F. Supp. 2d 1284, 1295 (N.D. Ga. 2010), *aff'd* 663 F.3d 1312 (11th Cir. 2011). Rather, "each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017) (quoting *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538-39 (5th Cir. 2004)). "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Greenberger v. IRS*, Civil Action No. 1:15-CV-3710-

AT, 2017 U.S. Dist. LEXIS 192956, at *5 (N.D. Ga. Sept. 28, 2017) (citing *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984)).

## II.   Summary Judgment As To Threshold Issues

Plaintiff moves for partial summary judgment on a number of issues, but only two are fully and independently briefed by the parties.  Those issues are also threshold issues to both Plaintiff's claims under the FMLA and the ADA.  The court addresses those issues below.

### A. Were IMS Gear Holding, Inc., IMS Gear Georgia, Inc., and IMS Gear Braking Systems LLC Plaintiff's Single Employer?

The FMLA only covers employers who employ at least 50 employees within a 75 mile radius of the worksite.  29 U.S.C. § 2611(2)(B)(ii).  Although Defendants here are separate legal entities, courts "may look beyond the nominal independence of two or more entities and treat ostensibly separate businesses as a single employer for the purposes of a claim arising under the ADA" or the FMLA. *Parton v. UPS*, 1:02-cv-2008-WSD, 2005 U.S. Dist. LEXIS 45985, at *20 (N.D. Ga. Aug. 3, 2005) (citing *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999)).  In determining whether separate entities should be considered a single employer or integrated enterprise, courts look to four factors:  " '(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.' " *Lyes*, 166 F.3d at 1341 (quoting *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 93

(11th Cir. 1987)).  "The totality of the circumstances controls, thus, no single factor is conclusive, and the presence of all four factors is not necessary to a finding of single employer."  *EEOC v. Dolphin Cruise Line*, 945 F. Supp. 1550, 1553 (S.D. Fla. 1996).

Plaintiff provides a lengthy argument in support of partial summary judgment on this issue, addressing each relevant factor, as to why Defendants IMS Gear Holding, Inc. ("Holding"), IMS Gear Georgia, Inc. ("Georgia"), and IMS Gear Braking Systems, LLC ("Braking") (collectively, "Georgia Defendants"), who Plaintiff asserts together employ more than 50 employees, (*see* Doc. 67-2 at ¶ 66), should be considered as one highly integrated employer for purposes of his FMLA claims.[4]  (*See* Doc. 67-1 at 3-12).

Plaintiff argues that all three entities were commonly owned, managed, and financially controlled.  (67-1 at 4).  For support, Plaintiff cites to Corbin's testimony admitting to that fact, (*see* Corbin 30:22-31:6), the fact that they each

---

[4] Defendants dispute the fact that those three entities collectively employed more than 50 employees, stating that "Defendants deny this statement in that it calls for a legal and factual conclusion on which Plaintiff bears the burden of proof."  (Doc. 69 at ¶ 66).  However, in support of that factual assertion, Plaintiff cites to quarterly wage reports and payroll reports for 2014-2016, to which Defendants do not object, as well as Chambers's testimony that Holding, Braking, and Georgia employ "about 270 employees at the Gainesville, Georgia location[.]"  (Chambers Dep. at 31:13-17).  The Court therefore finds that Defendants have failed to create an issue of fact with regard to the question of whether Holding, Georgia, and Braking collectively employed 50 employees during 20 or more work weeks at the time Plaintiff was terminated.

shared the same principal address, the same agent, and the fact that they shared officers, directors, and managing agents. (*See id.* at 6-7; *see also* Doc. 69 at ¶¶ 6-24). Further, Plaintiff pointed to the existence of "shared funding of working capital through two lines of credit that were established for their common use." (*Id.* at 7 (citing Corbin Dep. at 35:17-19, 36:10-15)). Plaintiff also pointed to the fact that "[b]efore Plaintiff's departure, . . . none of Holding's subsidiaries, including Georgia and Braking[,] had a loan agreement with Holding or its German parent regarding the use or repayment of funds drawn from those lines of credit." (Doc. 67-1 at 7). Defendants admit to each of these facts. (*See* Doc. 69 at ¶¶ 2-7, 10, 22-25). Regarding common management, Plaintiff points to the role of Gregory Vitek as CEO for Holding and Georgia in 2013, then solely CEO for Georgia in 2014, then CEO for Georgia and Holding again from 2015 to 2017, (*see* Pl. SMF at ¶ 10), to the fact that Vitek oversaw operations of Georgia and Braking, (*see id.* at ¶ 9), and to the fact that Vitek "called Gainesville-wide meetings, including safety training meetings . . . with [the] visiting German parent company directors, that included employees of all Gainesville business units—Holding, Georgia, and Braking." (*Id.* at ¶ 11; *see also* Doc. 67-1 at 5). Defendants admitted to these facts as well. (*See* Doc. 69 at ¶¶ 9-10).

Plaintiff also asserts that Holding, Braking, and Georgia shared a centralized control of labor relations. Plaintiff points to the fact that the human resources

department, for whom Chambers worked, was paid by Georgia but oversaw "human resources functions for both Georgia and Holding." (*See* Doc. 67-1 at 8 (quoting Chambers Dep. at 27:7)). Those functions included "payroll, recruiting and onboarding of employees, and any onboarding or termination processes and compensation and benefits." (Pl. SMF at ¶ 33). Defendants admitted to this assertion. (*See* Doc. 69 at ¶ 33). Plaintiff also points to an email from Chambers,[5] dated June 25, 2015 with the subject line "Georgia HR Team," which stated: "Below is an overview of who to see in the HR team for any concerns you have regardless to the business unit you work. We are here to support all functions at the Georgia location, including all location B[usiness] U[nit]s and Holding." (Doc. 68-4 at 17). Plaintiff also cited to Chambers's testimony confirming the functions described in the email as functions performed "by him and his subordinates for all Gainesville business units." (Doc. 67-1 at 9). Defendants disputed this fact, citing Chambers's testimony that the human resources department paid by Georgia only oversees functions for both Georgia and Holding "on some matters." (*See* Chambers Dep. at 27:7-11). However, that testimony contradicts his own email presented above. Further, Plaintiff pointed to Corbin's deposition testimony that Chambers offered consultation assistance in Corbin's decision to terminate Plaintiff, even though Corbin was an officer of Holding, Georgia, and Braking, and

---

[5] Chambers testified that he had no reason to doubt he had sent this email. (Chambers Dep. at 28:14-24).

Chambers was employed and paid by Georgia.  (*See id.*; *see also* Pl. SMF at ¶¶ 13-14).

Finally, regarding the interrelation of the Georgia Defendants' operations, Plaintiff points to the common ownership and centralized employment control already discussed, as well as to the facts that all the Georgia Defendants' officers were located in one building, Plaintiff's accounting work on behalf of all the Georgia Defendants (even though he was employed directly by Holding), and that Plaintiff was not required to distinguish the time he spent on accounting tasks between any of the Georgia Defendants.  (Doc. 67-1 at 10-11).   Additionally, Plaintiff pointed to the Georgia Defendants' common safety training, (*see, e.g.*, Doc. 68-12 at 8-9; Pl. SMF at ¶ 47), office protocols, (*see, e.g.*, Doc. 68-12 at 42, 44, 45-46), contract for ADP payroll services, (*see* Pl. SMF at 77 at ¶ 51), and liability policy, (*see id.* at ¶ 52).  Defendants admitted to these assertions.  (*See* Doc. 69 at ¶¶ 45, 47, 49, 52).  Having addressed all the relevant factors, Plaintiff argues that "the undisputed facts show that as a matter of law, Defendants Holding, Georgia and Braking are so integrated in their operations that they should be considered a single employer for purposes of the FMLA and the ADA."  (Doc. 67-1 at 12).

Defendants give sparse treatment to Plaintiff's lengthy, factor-driven argument on why all Defendants in this action are integrated.   In doing so,

Defendants rely heavily on their argument that "[n]one of the 11th Circuit cases cited by Plaintiff permit this Court to determine, as a matter of law, that Plaintiff has overcome the presumption that the Defendants are separate."  (Doc. 70 at 23). However, Defendants point to no authority prohibiting this Court from making such a finding at the summary judgment stage.  On the contrary, courts within the Eleventh Circuit, as well as those in other circuits, have granted plaintiffs' motions for partial summary judgment on the single-employer question as a matter of law. *See, e.g.*, *Dolphin Cruise Line*, 945 F. Supp. at 1554 (awarding the plaintiff partial summary judgment on the issue of whether the defendants were a single employer as a matter of law); *Centeno v. 75 Lenox Realty LLC/J.K. Mgmt. Corp.*, 14 CV 1916 (DLI) (LB), 2017 U.S. Dist. LEXIS 15008, at *27 (E.D.N.Y. Feb. 1, 2017) (finding on summary judgment that although the defendants were "separate legal entities . . . [t]he record evidence here is clear that [the defendants] should be considered a single-employer for the purposes of the discrimination laws."), *adopted by* 2017 U.S. Dist. LEXIS 50819 (E.D.N.Y. Mar. 31, 2017); *EEOC v. Oak Lawn Ltd.*, 987 F. Supp. 647, 652 (N.D. Ill. Dec. 1, 1997) (finding that the EEOC "has demonstrated that [the defendants] are essentially a single employer.  Thus, the EEOC's motion for summary judgment is granted[.]"); *EEOC v. Midamerica Hotels Corp.*, Case No. 4:03CV107 HEA, 2004 U.S. Dist. LEXIS 8169, at *13-14 (E.D. Mo. Mar. 8, 2004) ("Based on the factors which must be assessed for the

'single employer' determination, the undisputed facts establish that, as a matter of law, [the defendants] are a single employer of the individual plaintiffs").

The only factor Defendants address in their response is the "common ownership" factor, though instead of specifically pointing out why this factor cuts against Plaintiff, Defendants merely cite to *Morrison* for the proposition that "similar facts have been found insufficient as a matter of law to show integration." (Doc. 70 at 23). *Morrison* is easily distinguished from this case. The plaintiff in *Morrison*, an airplane pilot, unsuccessfully argued that the company who owned the plane that he flew, Amway, and the company who leased the plane for special events, RDV, together formed an integrated employer. 383 F.3d at 1257. The Eleventh Circuit found that the plaintiff provided no evidence as to common management, and weak evidence that the two entities were interrelated, consisting only of an occasion on which RDV asked Amway for advice in structuring internal operations. *Id.* Further, plaintiff was found to have only satisfied one factor— common ownership. *Id.* The Eleventh Circuit ultimately found that Plaintiff provided insufficient evidence of integration required to bring his FMLA claims. *Id.* at 1258.

By contrast, Plaintiff here has provided ample unopposed evidence addressing every factor, including that of "common ownership." (*See* Doc. 67-1 at 3-12). Furthermore, even if that factor did not weigh in favor of Plaintiff's single-

empoyer argument, Defendants have not addressed any of the other factors, which are also relevant to the ultimate determination at this stage. *See Dolphin Cruise Line*, 945 F. Supp. at 1553 ("[T]he presence of all four factors is not necessary to a finding of single employer.").

In short, in opposing Plaintiff's motion for partial summary judgment, Defendants were required to "make a showing sufficient to establish the existence of an element essential to [Plaintiff's] case, and on which [he] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Defendants have not done so with regard to Plaintiff's argument that the Georgia Defendants, as an integrated enterprise, were Plaintiff's single employer. Instead, Defendants appear to rely on boilerplate assertions that the Georgia Defendants were separate entities, that Plaintiff's evidence is insufficient, (*see* Doc. 70 at 23), and that "there is a dispute to be resolved at trial regarding whether the entities are highly integrated" (Doc. 70 at 2), without any authority as to why that determination cannot be made at the summary judgment stage. Even viewing the facts in the light most favorable to them, because Defendants have not pointed to any specific triable issues of fact requiring the submission of this determination to a jury, and in view of the liberal construction courts are to give the term "employer" under the ADA, the undersigned finds that Plaintiff has carried his burden to demonstrate that, as a matter of law, Defendants "should be treated as an integrated enterprise" for

purposes of his ADA and FMLA claims.  *Lyes*, 166 F.3d at 1341; *see also Olynyk v. CRA Occupational Health, Inc.*, Case No. 3:04CV7249, 2005 U.S. Dist. LEXIS 12104, at *19 (N.D. Ohio June 21, 2005) ("[T]he protections afforded by legislation, suich as the ADA and its underlying policies, are promoted and enhanced by applying a liberal, rather than overly conservative standard, for determining the individual's employer."), *aff'd* 2006 U.S. App. LEXIS 31416 (6th Cir. Dec. 18, 2006).

Accordingly, it is **RECOMMENDED** that Plaintiff's motion for partial summary judgment on the issue of whether Defendants IMS Gear Holding, Inc., IMS Gear Georgia, Inc., and IMS Gear Braking Systems, LLC were his employer for purposes of his FMLA and ADA claims be **GRANTED**.

### B. Did Plaintiff Have A Disability As Defined By The ADA?

Plaintiff also moves for partial summary judgment on the question of whether Plaintiff had a disability for purposes of the ADA.  (Doc. 67-1 at 13-15). The ADA defines a "disability" to include "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]"  42 U.S.C. § 12102(1)(A).  The ADA's regulations define "physical or mental impairment" as "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as . . . digestive[.]"  29 C.F.R. § 1630.2(h).  Further, "major life activities" include "sleeping, concentrating, thinking, . . . and working"

as well as "the operation of a major bodily function, including functions of the . . . digestive" and "bowel[.]"  29 C.F.R. § 1630.2(i)(i) and (ii).  The ADA includes a general instruction that the term "disability" be "construed in favor of broad coverage."  42 U.S.C. § 12102(4)(A).

In support of his motion, Plaintiff attaches a declaration completed by his treating physician, Scott A. Clark, M.D.  (Doc. 67-3).  That declaration states that Dr. Clark diagnosed Plaintiff with severe ulcerative colitis in 2009, and that patients with that condition will "not infrequently . . . have bowel movements 20 to 30 times a day over which they have very little control."  (*Id.* at ¶¶ 7, 13).  Dr. Clark also stated that people with this condition "will often have blood in their stools" making it "really tough to do anything except have bowel movements.  The diarrhea becomes uncontrollable."  (*Id.* at ¶ 14).  In addition, he stated that the condition causes "incredible abdominal pain and cramping[,]" which make it "almost impossible for anybody to do what they're supposed to do when they're having an active flare," and trouble sleeping, (*Id.* at ¶¶ 15, 17).  Plaintiff argues that his ulcerative colitis condition "substantially limits him in his digestive and bowel functions" such that it severely impacts his ability to eat, sleep, work, or even leaving the house at times.  (Doc. 67-1 at 13-15).  Plaintiff's statement of facts on this issue, none of which Defendants dispute, generally agree with Dr. Clark's description of Plaintiff's condition as "severe."  (*See* Doc. 69 at ¶¶ 56-65).

Defendants' only response to Plaintiff's argument on this matter is as follows:

> Plaintiff is not entitled to an order of summary judgment on the issue of whether he was a disability within the definitions of the ADA, because Defendants should have the right at trial to cross exam [sic] the doctors' [sic], who was never identified as an expert, diagnosis and opinions and foundations for those opinions.

(Doc. 70 at 2). Defendants do not cite any authority for their proposition. On reply, Plaintiff cites to the Eleventh Circuit's allowance for a treating physician to offer lay opinion testimony without being identified as an expert "if he or she testified about observations based on personal knowledge, including the treatment of the party." (Doc. 73 at 9 (citing *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317 (11th Cir. 2001); *Wilson v. TASER Int'l, Inc.*, 303 Fed. Appx. 708, 712 (11th Cir. 2008) (unpublished decision)).

The Court finds that Plaintiff is entitled to summary judgment on the issue of whether he has a disabled as defined by the ADA. Plaintiff's unopposed factual assertions, in combination with his Dr. Clark's declaration, demonstrate that his severe ulcerative colitis "substantially limits" his ability to sleep, concentrate, work, or operate his digestive and bowel systems, and thus, he is disabled as defined by the statute. 42 U.S.C. § 12102(1)(A) and (B); 29 C.F.R. § 1630.2(i)(i) and (j). Contrary to Defendants' assertion, Dr. Clark did not need to be qualified as an expert, and the Court accepts the portions of Dr. Clark's declaration on which

Plaintiff relies in explaining the impact of his disability because Dr. Clark's assertions were offered as lay opinion testimony "based on his experience as a physician" treating Plaintiff's condition. *Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir. 1999) (cited with approval in *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005)); *accord Williams*, 644 F.3d at 1317. Because Defendants have failed to create a triable issue of fact on whether Plaintiff had a disability as defined by the ADA, the undersigned finds that Plaintiff has carried his burden of showing that he is entitled to summary judgment on this issue. *See Coker v. Enhanced Senior Living, Inc.*, 897 F. Supp. 2d 1366, 1376 (N.D. Ga. Sept. 18, 2012) (relying on "unrebutted affidavit testimony of [the plaintiff's] treating physician" and awarding partial summary judgment to plaintiff on the issue of whether she had a disability under the ADA).

Accordingly, it is **RECOMMENDED** that Plaintiff's motion for partial summary judgment on the issue of whether he has a disability as defined by the ADA be **GRANTED**.

## III.   Plaintiff's FMLA Claims (Counts I and II)

Plaintiff also moves for summary judgment on his claims of interference and retaliation under the FMLA. (*See* Doc. 67-1 at 15-32). Defendants too move for summary judgment on both claims. (*See* Doc. 66-1 at 21-26). The Family and Medical Leave Act ensures that eligible employees may take up to twelve weeks of

unpaid leave, during which their employment status is protected, because of, *inter alia*, "a serious health condition that makes the employee unable to perform the functions of the position of such employee."   29 U.S.C. § 2612(a)(1)(D).[6]   In *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349 (11th Cir. 2000), the Eleventh Circuit explained:

> The FMLA recognizes two types of claims for alleged violations of [29 U.S.C. §§ 2611, *et seq.*]: interference claims, in which employers burden or outright deny substantive statutory rights to which their employees are entitled, *see* 29 U.S.C. § 2615(a)(1) (1999), and retaliation claims, in which employers discharge employees for exercising their FMLA right to leave, *see id.* § 2615(a)(2).

200 F.3d at 1352 (footnotes omitted).

## A. FMLA Interference (Count I)

Both Plaintiff and Defendants move for summary judgment on this claim. "To prove FMLA interference, an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA." *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1266-67 (11th Cir. 2008) (citing 29 U.S.C. § 2615(a)(1) and *Strickland v. Water Works and Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001)).   The employee must also demonstrate that he "has been prejudiced by the violation in some way." *Ragsdale v. Wolverine World Wide,*

---

[6] "A 'serious health condition' denotes 'an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital . . . ; or (B) continuing treatment by a health care provider.' " *Lee v. United States Steel Corp.*, 450 Fed. Appx. 834, 836 (11th Cir. 2012) (unpublished decision) (quoting 29 U.S.C. § 2611(11)).

*Inc.*, 535 U.S. 81, 89 (2002).  "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220(b).

### 1. Interference For Failure To Provide Notice Under 29 C.F.R. § 825.300(e)

Plaintiff argues that Defendants twice failed to provide him notice that he was eligible for FMLA leave within five days after acquiring knowledge of his FMLA-eligible condition in August 2015 and January 2016.  (Doc. 71 at 9-10).  Defendants contend that Plaintiff's FMLA employer-notice claim was "never alleged in his Complaint nor in his 233 paragraph Amended Complaint[.]"  (Doc. 72 at 3).

" 'When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances.' "  *Crawford v. City of Tampa*, 464 Fed. Appx. 856, 857 (11th Cir. 2012) (unpublished decision) (quoting 29 C.F.R. § 825.300(b)(1)).  "Consequences for failing to provide notice to its employees 'may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights.' "  *Id.* (quoting 29 C.F.R. § 825.300(e)).

The undersigned finds that Defendants are entitled to summary judgment on both of Plaintiff's employer-notice claims.  Critically, as Defendants point out,

Plaintiff's lengthy Amended Complaint did not allege that Defendants failed to give FMLA notice as required by 29 C.F.R. § 825.300(e). (*See* Am. Compl. at ¶¶ 59-85). Instead, the only allegation of FMLA interference in Plaintiff's Amended Complaint is associated with Corbin's assignment of additional tasks for the year-end closing process on January 18, 2016. (*Id.* at ¶ 80). Plaintiff also did not seek leave from this Court to amend his claims later as he was permitted to do under FED. R. CIV. P. 15.[7] Plaintiff "may not amend [his] complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); *see also White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1200 (11th Cir. 2015) (affirming the district court's finding of summary judgment in favor of the defendant where the plaintiff's "complaint contains no mention of the notice (or lack thereof) given by [the defendant] to its employees, or the FMLA's employer-notice requirements"); *Klein v. L-3 Communs. Corp.*, Case No.: 1-12-cv-956-MEF, 2013 U.S. Dist. LEXIS 156663, at

---

[7] Plaintiff states that "[t]he amended Complaint details his August 2015 post flare-up discussions with Corbin and Chambers and alleged 'Corbin's interference with Plaintiff's right to medical leave contributed to the termination of his employment[.]' " (Doc. 73 at 10 n.2 (quoting Am. Compl. at ¶¶ 33-35, 85)). However, the Amended Complaint still makes no mention of a failure to provide notice of FMLA rights, and in any event, Plaintiff's specific interference claim references the January 2016 incident in detail without ever discussing Plaintiff's absence in August 2015. (*See id.* at ¶¶ 59-85). In short, Plaintiff's unpleaded claims do not survive. *See, e.g., Klein*, 2013 U.S. Dist. LEXIS 156663 at * 41 (finding that the plaintiff's employer-notice claim was not separately pled and therefore could not be raised at summary judgment).

*41 (M.D. Ala. Nov. 1, 2013) (granting summary judgment to employer where employee "raises for the first time an FMLA interference claim based on [her employer's] failure to comply with certain FMLA notice provisions. . . . [S]uch an interference claim has never been pled and cannot be raised for the first time in response to its motion for summary judgment"); *Andrews v. CSX Transp., Inc.*, Case No. 3:06-cv-704-J-32HTS, 2009 U.S. Dist. LEXIS 119155, at *37 n.16 (M.D. Fla. Dec. 22, 2009) (noting that the plaintiff "cannot raise this new unpleaded claim in a motion for summary judgment without first obtaining leave to amend her complaint to reflect the [] claim").

Consequently, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's unpleaded claims that Defendants violated FMLA's notice requirements in August 2015 and January 2016 and that Plaintiff's motion for summary judgment on those claims be **DENIED**.

### 2. Interference Associated With Plaintiff's January 2016 Illness

Plaintiff's Amended Complaint alleges that Defendants interfered with his ability to seek FMLA leave when Corbin assigned "him additional work throughout the day and into the evening of January 18, 2016." (Am. Compl. at ¶ 80). Defendants argue that they are entitled to summary judgment on this claim because "[t]here is no evidence or even allegation that Plaintiff was not afforded

any requested leave" (Doc. 66-1 at 21), specifically arguing that "[t]he *first* time Plaintiff states that he could no longer work and the *first* time he asks for leave is on Tuesday January 19, 2016 at 2.25 pm.  Thereafter, Mr. Corbin did not assign additional work to Plaintiff and Plaintiff did not do any work."  (Doc. 72 at 6 (citing Doc. 67-7 at 1; Hein Dep. at 112:2-113:23) (emphasis in original)). Plaintiff also maintains that he is entitled to summary judgment on this claim, arguing that Defendants continued to assign work to him despite having given sufficient notice for his need for FMLA-qualifying leave.  (Doc. 67-1 at 25-28). For the following reasons, the Court finds that neither party is entitled to summary judgment on these claims.

The FMLA requires an employee to give his employer 30 days' advance notice of the need to take leave if the need for leave is foreseeable.  29 U.S.C. § 2612(e)(2).  However, in the case of an unforeseeable need to take FMLA-qualifying leave, "an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case."  29 C.F.R. § 825.303(a).  Defendants do not appear to dispute that Plaintiff's flare-up due to eating bad sushi, for which Plaintiff argues he was entitled to leave under the FMLA, was unforeseeable.  (*See* generally Doc. 72 at 4-6).  Concerning the content of proper notice to an employer, the FMLA's regulations require that "[a]n employee shall provide sufficient information for an employer to reasonably

36

determine whether the FMLA may apply to the leave request.  Depending on the situation, such information may include that a condition renders the employee unable to perform the functions of the job[.]"  29 C.F.R. § 825.303(b).  "Once an employee gives sufficient notice to h[is] employer that potentially FMLA-qualifying leave is needed, the employer must then ascertain whether the employee's absence actually qualifies for FMLA protection."  *Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379, 1383 (11th Cir. 2005) (citing *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1209 (11th Cir. 2001)).  Finally, "[a]s a general rule, an employee need not explicitly mention the FMLA when giving notice to h[is] employer."  *White*, 789 F.3d at 1196 (citing 29 C.F.R. § 825.303(b)).

Here, because the parties do not dispute that Plaintiff was assigned additional tasks on Monday, January 18 as Plaintiff alleges, the critical question on Plaintiff's FMLA interference claim is whether Plaintiff's notice was adequate, i.e., whether "the information imparted to the employer [was] sufficient to reasonably apprise it of the employee's request to take time off for [an FMLA-qualifying need]" such that Corbin's assignment of tasks to Plaintiff on Monday night discouraged or otherwise interfered with Plaintiff's ability to take FMLA leave to seek treatment.  *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995); *see also Shelton v. Price Waterhouse Coopers, LLP*, Case No.: 8:12-cv-02757-T-27TBM, 2014 U.S. Dist. LEXIS 61359, at *10-11 (M.D. Fla.

May 2, 2014) ("For summary judgment purposes, therefore, the appropriate inquiry is whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has complied with the FMLA's notice requirements as a matter of law.") (citation omitted).  The parties do not dispute that Plaintiff repeatedly informed Corbin of issues related to his upset stomach in the days and hours leading up to his email on the afternoon of Tuesday, January 19, including the necessity that he work on assignments from home.  (*See* Doc. 67-5 at 1; Doc. 67-6 at 1).  However, Defendants argue that, as a matter of law, Plaintiff only provided adequate notice that he needed leave in his Tuesday afternoon email.  (*See* Doc. 72 at 6).  The undersigned disagrees.

The record demonstrates that as early as Sunday afternoon, Plaintiff communicated his troubling condition to Corbin and the rest of the accounting team.  (*See* Doc. 67-5 at 1 (notifying Corbin of Plaintiff's need to work from home due to upset stomach, loss of fluids, and need to seek medical care for "medication and infusion"); Doc. 67-6 at 1 (notifying accounting team that Plaintiff would be working from home and anticipated seeing the doctor because of upset stomach)).  Further, Corbin admitted in his deposition that he understood Plaintiff wanted to go to urgent care on Monday, and that "having diarrhea for a couple of days could be particularly serious for someone with a chronic digestive disorder[.]"  (Corbin Dep. at 111:13-113:1).  Despite his awareness of Plaintiff's condition as early as Sunday

evening, email correspondence between Corbin and Plaintiff illustrates that Corbin continued to assign year-end closing tasks to Plaintiff throughout the day on Monday and into the early morning hours of Tuesday.  (*See* Doc. 67-8 at 2; Doc. 67-7 at 2-4).   Further, the record establishes that Defendants were aware of Plaintiff's ulcerative colitis and the occasional "flare-ups" that the condition presented.  (*See* Chambers Dep. at 59:15-60:10).   Apart from disclosing his condition on a post-hiring medical questionnaire, (*see* Doc. 68-5 at 6), Plaintiff had earlier requested time off from Corbin due to a flare-up of his ulcerative colitis. (*See* Corbin Dep. at 81:16-82:5).  Finally, Defendants do not appear to dispute that Plaintiff had a chronic serious health condition for FMLA purposes.  (Doc. 72 at 2; *see generally* Doc. 70).

"Adequacy of notice is consistently regarded as a finding of mixed fact and law.  'The question of whether notice was given, and if so, what the notice consisted of and when it was given, is one of fact.' "  *Smith v. Constr. Datafax, Inc.*, 871 F. Supp. 2d 1226, 1237 (N.D. Ala. 2012) (quoting *Cavin v. Honda of Am. Mfg.*, 346 F.3d 713, 725 (6th Cir. 2003)).  The undersigned finds that, construing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Plaintiff's communications to Corbin constituted adequate notice "sufficient to make [Defendants] aware that [Plaintiff] need[ed] FMLA-qualifying leave[.]" *Cruz*, 428 F.3d at 1383.  Because the parties' dispute focuses on a question of

fact—namely, whether the timing and contents of Plaintiff's communications to Corbin on January 17 and 18, 2016 put Defendants on notice that Plaintiff's condition might warrant FMLA-qualifying leave—summary judgment is due to be denied to both parties on Plaintiff's claim of interference under the FMLA. *See Cabrera v. Town of Lady Lake*, Case No. 5:10-cv-415-Oc-34PRL, 2013 U.S. Dist. LEXIS 201324, at *73 (M.D. Fla. Mar. 28, 2013) (finding that the plaintiff "has presented sufficient evidence to create a genuine issue of fact regarding the adequacy of her notice to [her employer] that she would be taking FMLA leave"); *see also Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008) ("whether an employee gave sufficient information to put his or her employer on notice that an absence may be covered by the FMLA is a question of fact for the jury.").

Defendants argue that Plaintiff did not provide adequate notice of his need for FMLA-qualifying leave until his email on Tuesday afternoon: "The *first* time Plaintiff states that he could no longer work and the *first* time he asks for leave is on Tuesday January 19, 2016 at 2:25 p.m." (Doc. 72 at 6 (citing Doc. 67-7 at 1) (emphasis in original)). However, this argument is unpersuasive because it places a heavier burden of notice on Plaintiff than what is required under the FMLA when the need for leave is unforeseeable. "There are no categorical rules governing the content of notices – i.e. what is sufficient to put an employer on notice and what is not," and an employee is not required to utter "magic words." *Smith*, 871 F. Supp.

2d at 1236.  All that is required is "enough information to put the employer on notice that an event described in the FMLA may have occurred."  *Id.* (citing *Cruz*, 428 F.3d at 1383-84).  Once such notice is given, the burden is on the employer to "ascertain whether the employee's absence actually qualifies for FMLA protection."  *Cruz*, 428 F.3d at 1383.  As recounted above, Plaintiff told Corbin on Sunday of his need to both work from home and ultimately see a doctor on Monday.  (Doc. 67-5 at 1).  And Corbin himself testified both that he understood Plaintiff "wanted to stop working at some point on Monday to be able to go to Urgent Care for treatment[,]" (Corbin Dep. at 114:4-8), and that Plaintiff's symptoms, as he reported them to Corbin on Sunday, were cause for concern.  (*Id.* at 11:17-112:2).  Chambers, too, admitted that being "dehydrated and need[ing] an infusion and need[ing] to be out of work for a week" would be potentially involve a serious health condition requiring FMLA leave.  (Chambers Dep. at 64:19-65:4).  Consistent with the record, then, a reasonable trier of fact could conclude that Corbin was put on notice that Plaintiff's condition was serious enough to qualify for FMLA leave as early as Sunday and, rather than investigating further as the FMLA requires, continued to require Plaintiff to work in order to close out the year-end tasks.  However, viewing the facts in the light most favorable to Defendants, a reasonable jury could also conclude that Plaintiff did not provide sufficient notice that he needed to stop working until Tuesday afternoon, when

41

Corbin stopped assigning him additional tasks and from which point he ceased working for the rest of the week.  As such, a triable issue exists on whether Plaintiff provided adequate notice such that Defendants' should have allowed Plaintiff to stop work and seek treatment or at least investigated further to determine whether Plaintiff's condition required FMLA leave.  *See Flynn v. Fid. Nat'l Mgmt. Servs., LLC*, Case No: 6:16-cv-87-Orl-40TBS, 2017 U.S. Dist. LEXIS 45306, at *21 (M.D. Fla. Mar. 28, 2017) (denying summary judgment where the plaintiff's "email correspondence with [her employer], coupled with [her employer's] knowledge that [the plaintiff] suffered from a serious health condition covered by the FMLA, provided sufficient information to place [her employer] on notice of [her] need for continuous FMLA leave"); *Smith*, 871 F. Supp. 2d at 1236 (denying summary judgment on the plaintiff's FMLA interference claim where a fact issue existed as to whether the plaintiff's notice for unforeseeable leave was adequate).

Accordingly, with regard to Plaintiff's claim of FLMA interference associated with his January 2016 illness, it is **RECOMMENDED** that Defendants' motion for summary judgment be **DENIED** and Plaintiff's motion for summary judgment be **DENIED**.

### B. FMLA Retaliation (Count II)

42

The FMLA provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title . . . ." 29 U.S.C. § 2615(a)(2). "To establish a prima facie case of FMLA retaliation, an employee must show that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment decision, and (3) the decision was causally connected to the protected activity." *Lee v. United States Steel Corp.*, 450 Fed. Appx. 834, 838 (11th Cir. 2012) (unpublished decision)." "An employee asserting a retaliation claim has the added burden of 'showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus.' " *Gutter v. GuideOne Mut. Ins. Co.*, 17 F. Supp. 3d 1261, 1272 (N.D. Ga. 2014) (quoting *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1267 (11th Cir. 2008)). Finally, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions[.]" 29 C.F.R. 825.220(c).

Where, as here, a plaintiff does not point to direct evidence of an employer's intent, FMLA retaliation claims are governed by the *McDonnell Douglas* burden-shifting framework. *See Morgan*, 477 Fed. Appx. at 628 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). Under the *McDonnell Douglas* analysis, the plaintiff first must establish a prima facie case of retaliation by showing that "(1) he availed himself of a protected right under the FMLA; (2)

43

he suffered an adverse employment decision; and (3) there [was] a causal connection between the protected activity and the adverse employment decision." *Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001). If the plaintiff

> establishes a prima facie case, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer retaliated against the employee. This may be done by the employer articulating a legitimate, non-retaliatory reason for the employment decision, which is clear, reasonably specific, and worthy of credence.

*Walker v. Elmore Cnty. Bd. of Educ.*, 223 F. Supp. 2d 1255, 1261 (M.D. Ala. 2002) (citing *McDonnell Douglas*, 411 U.S. at 802). "If the employer does so, the plaintiff must demonstrate that the employer's proffered reason is a pretext for retaliation." *Morgan*, 477 Fed. Appx. at 628 (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)).

It is undisputed that Plaintiff suffered an adverse employment action when he was terminated in January 2016. (*See* Hein Dep. at 123:4-9). Defendants base their argument on the notions that: (1) Plaintiff has failed to establish a prima facie retaliation claim because "he never took or requested FMLA leave[,]" (Doc. 66-1 at 22); and (2) even if Plaintiff were able to establish a prima facie retaliation claim, he cannot rebut the fact that he was fired for the non-discriminatory reason of "poor job performance—particularly his failure to complete tasks on time and correctly." (*Id.* at 25). Plaintiff argues that Defendants retaliated against him as a

44

matter of law because Corbin referenced Plaintiff's absence while on medical leave in his reasons for terminating Plaintiff.  (Doc. 67-1 at 33).

### 1.  Statutorily-Protected Activity

First, the undersigned finds that Plaintiff has established a prima facie case of FMLA retaliation.  As discussed at length above and contrary to Defendants' argument, Plaintiff has created a genuine issue of fact on the question of whether he provided adequate notice to Corbin that he required leave under the FMLA before his email on Tuesday afternoon.  *See infra*, § II.A.1.ii.  Moreover, even Defendants concede that Plaintiff requested leave as late as Tuesday, January 19 in his email to Corbin describing the symptoms related to his serious health condition and requesting to be taken off year-end assignments, which qualifies as a request for leave for an FMLA-qualifying reason.  (*See* Doc. 72 at 6; *see also* Doc. 67-7 at 1; Doc. 68-5 at 10).  Thus, Plaintiff has satisfied the first element of his prima facie case.

Defendants' arguments to the contrary are ultimately unpersuasive.  First, their assertion that under *Strickland*, an FMLA retaliation claim "requires the employee to show his employer knew that the employee was invoking the protection of FMLA[,]" (Doc. 72 at 7), is unavailing because the facts here differ substantially from those before the Court in *Strickland*.  There, the plaintiff alleged that he had told his supervisor he needed FMLA leave due to a diabetic attack, but

> [t]he record presented to the district court on summary judgment []
> contained no support for this allegation; nothing in Strickland's
> affidavits or the other materials before the court would permit a jury
> to find that [plaintiff's supervisor] or anyone else employed by [the
> employer] had notice that Strickland was invoking the protection of
> the FMLA when he left work that day.  Nor did Strickland refer to the
> FMLA at any time prior to the Board's March 14 decision to
> discharge him.

*Id.*, 239 F.3d at 1207.  By contrast, the record here illustrates that Plaintiff's

Tuesday afternoon email to Corbin included sufficient information to put Corbin

on notice that he was suffering from a serious, FMLA-qualifying condition.  (*See*

Docs. 67-5 through 67-7; *see also* Corbin Dep. at 111:13-112:2).  "So long as the

employee conveys sufficient information to place the employer on notice that []he

needs FMLA leave for a qualifying reason, the employee has engaged in protected

activity."  *Flynn*, 2017 U.S. Dist. LEXIS 45306 at *9 (citing *Gay v. Gilman Paper

Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997); *Cruz*, 428 F.3d at 1383-1385)); *see also

Corriveau v. Starbucks Coffee Co.*, Case no. 08-61794, 2010 U.S. Dist. LEXIS

144712, at *57-58 (S.D. Fla. Mar. 12, 2010) ("Put simply, in order to have engaged

in a statutorily protected activity for FMLA purposes, an employee seeking FMLA

leave must adequately convey to her employer sufficient information to put the

employer on notice that the absence is due to a potentially FMLA-qualifying

reason.") (citations omitted).  Therefore, because Plaintiff requested to stop

working in his email to Corbin on Tuesday afternoon due to his serious health

condition, it is undisputed that he engaged in a statutorily-protected activity, which satisfies the first element of his prima facie FMLA retaliation claim.

### 2. Causal Connection

Next, the undersigned finds that Plaintiff has created an issue of fact as to whether his termination was causally related to his need for FMLA-qualifying leave. "The causal link element is construed broadly so that a plaintiff merely has to provide that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001); *see also Corriveau*, 2010 U.S. Dist. LEXIS 144712 at *61 (applying broad construal of causal link to FMLA retaliation claim). A plaintiff is merely required to show "that 'the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated.' " *Curtis v. Broward Cnty.*, 292 Fed. Appx. 882, 885 (11th Cir. 2008) (quoting *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (unpublished decision)).

It is undisputed that Plaintiff was terminated on January 27, 2016, two days after he returned from leave. (Def. SMF at ¶ 65). Plaintiff can arguably establish a causal connection on this temporal proximity alone. *Mihoubi v. Caribou Coffee Co.*, 288 Fed. Appx. 551, 557 (11th Cir. 2008) (unpublished decision) ("Causation may be inferred by close temporal proximity between the protected activity and the

adverse employment action."). However, the record also demonstrates that one of the reasons referenced in Corbin's decision to terminate Plaintiff was his absence during the accounting team's preparation for the 2015 external financial audit. (*See* Doc. 68-10 at 15).[8] Because of these reasons, Plaintiff has satisfied the third and final element of his retaliation claim.

### 3. Defendants' Legitimate, Non-Discriminatory Reason

However, Defendants argue that even if Plaintiff is able to establish a prima facie case of retaliation under the FMLA, they have articulated a sufficient reason for Plaintiff's termination—namely, "poor job performance—particularly his failure to complete tasks on time and correctly." (Doc. 66-1 at 25). By doing so, Defendants have met their "exceedingly light" requirement to produce a nondiscriminatory reason. *See Smith v. Boyd Bros. Transp., Inc.*, 406 F. Supp. 2d 1238, 1245 (M.D. Ala. 2005) (finding that the employer simply had to produce a

---

[8] In Plaintiff's responses to Defendants' statement of material facts, Plaintiff objects to the admissibility of the email of these documents on grounds of hearsay and failure to properly authenticate. (*See* Doc. 71-3 at 16). However, Plaintiff introduces the same exhibit into the record as part of Corbin's deposition. (*See* Corbin Dep. at 187:18-19; Doc. 68-10 at 15). Plaintiff further cites to this document for support in his response to Defendants' motion for summary judgment. (*See* Doc. 71 at 15). In any event, it appears clear that the exhibit in question could be later authenticated as required under FED. R. EVID. 901 as well as "reduced to admissible form as [a] record[] of a regularly conducted business activity." *Saunders v. Emory Healthcare, Inc.*, Civil Action File No. 1:07-cv-0282-WSD, 2008 U.S. Dist. LEXIS 125526, at *11-12 (N.D. Ga. Dec. 30, 2008), *aff'd* 360 Fed. Appx. 110 (11th Cir. 2010) (unpublished decision). Therefore, the Court will consider this exhibit as part of the record for purposes of both summary judgment motions.

reason; "it does not have to persuade the court that it was actually motivated by the reason advanced") (citing *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994)).

### 4. Pretext

With Defendants having articulated a legitimate reason for Plaintiff's termination, Plaintiff is required to "demonstrate that the employer's reason was actually a pretext for discrimination." *Caldwell v. Clayton Cnty. Sch. Dist.*, 604 Fed. Appx. 855, 861 (11th Cir. 2015) (unpublished decision). Plaintiff bears "the ultimate burden of proving that FMLA leave was the determinate factor" in his termination. *Kaylor v. Fannin Regional Hosp.*, 946 F. Supp. 988, 1000 (N.D. Ga. 1996) (citing 29 U.S.C. § 2615(a)(2)). "Evidence used to establish a prima facie case may also be used to establish pretext." *Id.* (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

The undersigned finds that Plaintiff has presented sufficient evidence to create a triable issue of fact on whether Plaintiff's taking of FMLA-qualifying leave precipitated Corbin's decision to terminate him, but fails to demonstrate that this unlawful reason motivated Corbin's decision as a matter of law. First, while temporal proximity may not be enough on its own to establish pretext, it is certainly a strong contributing factor to be considered where, as here, the termination took place two days after Plaintiff returned from leave. *See Jones v.*

*Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1276 (11th Cir. 2017) ("[C]lose temporal proximity to an employee's protected FMLA activity and his termination 'is evidence of pretext, though probably insufficient to establish pretext all by itself[.]' ") (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006)); *see also Young v. McCarthy-Bush Corp.*, Civil Action No. 1:12-CV-3623-RWS, 2014 U.S. Dist. LEXIS 38084, at *35 (N.D. Ga. Mar. 24, 2014) (denying summary judgment where "the close temporal proximity between the protected activity and the adverse employment decision provides even more forceful evidence that Defendant retaliated against Plaintiff for requesting FMLA leave").

The timing of Plaintiff's termination also undermines Defendants' proffered rationale because, while Corbin's "concerns for Plaintiff's poor job performance" may have "predated his alleged FMLA leave[,]" (Doc. 66-1 at 25; Doc. 72 at 10), the undisputed fact remains that Corbin could have terminated Plaintiff earlier, but he was not actually terminated until two days after he returned from leave. (*See* Def. SMF at ¶ 65; *see also* Chambers Dep. at 72:9-11). Moreover, in his rationale for terminating Plaintiff, Corbin specifically references Plaintiff's absence while on medical leave, indicating that the rationale he expresses only came about *after* Plaintiff took leave. (*See* Doc. 66-9 (noting Plaintiff's absence "during the week

prior to the start of our 2015 annual external financial audit" as an example of Plaintiff's problems with "reliability")).

However, the Court also notes that for purposes of Plaintiff's motion for summary judgment, Plaintiff has failed to demonstrate that there are no triable issues with regard to whether Defendants' proffered reason for his termination was pretext to mask retaliation. The conflicting evidence in the record prevents the Court from going further and concluding that, as a matter of law, Plaintiff's absence during January 2016 was the precipitating event to Corbin's decision to fire him. Therefore, for several reasons, it appears that a triable issue exists as to whether Plaintiff's leave was a precipitating event in Corbin's decision to terminate him. *See Corbin v. Medical Ctr., Navicent Health*, Civil Action No. 5:15-CV-153 (CAR), 2016 U.S. Dist. LEXIS 134159, at *34-35 (M.D. Ga. Sept. 29, 2016) (finding that "although Barber could have initiated termination proceedings earlier, the fact he initiated such proceedings only after plaintiff invoked her FMLA leave . . . supports a finding of pretext"); *see also Gutter*, 17 F. Supp. 3d at 1274 (denying summary judgment where "a reasonable jury could infer from the evidence challenging [the decisionmaker]'s testimony that [the plaintiff]'s termination was precipitated by her request for FMLA leave, and that [her employer]'s proffered reason is pretextual").

Defendants continually rely on Corbin's statement that "an accumulation of many performance issues" is what ultimately led to his decision to terminate him. (Doc. 66-1 at 26; *see also* Corbin Dep. at 179:16-17).  While Defendants may be accurate in stating that Plaintiff exhibited performance issues that Corbin found to be concerning, this is not the ultimate inquiry.  Instead, the Court must determine whether Plaintiff's "past use of FMLA leave was a motivating factor" in Corbin's decision.  *Smith v. Bellsouth Telecomms., Inc.*, 273 F.3d 1303, 1314 (11th Cir. 2001).  As has been noted, if the oft-stated performance issues were the ultimate reason for Plaintiff's termination as evidenced by Corbin's December 4, 2015 email to Chambers, (*see* Doc. 66-6), it is unclear why Plaintiff was permitted to go on working for Defendants for more than a month before he was terminated. Further, while Corbin references Plaintiff's performance issues in the email explaining his reasoning, he also expressly references Plaintiff's absence while he was on leave as reasoning for his decision.  (*See* Doc. 66-9 at 2 (referencing Plaintiff's absence during the year-end pre-audit period)).  From this evidence, a reasonable jury could conclude that Plaintiff's absence during year-end closing either (1) was not a precipitating factor in Corbin's decision, or (2) that it formed the basis for Corbin's decision to terminate Plaintiff.  Summary judgment is thus inappropriate under such circumstances.  *Smith*, 273 F.3d at 1314 (denying

summary judgment where the decision-maker cited the plaintiff's FMLA absences, in addition to other factors, for his decision not to rehire him).

Finally, Defendants invite this Court to apply a "but-for" causation standard in rejecting Plaintiff's argument that Defendants' reason for his termination was pretextual.  In doing so, Defendants cite to *Jones v. Allstate Insurance Co.*, No. 2:14-CV-1640-WMA, 2016 U.S. Dist. LEXIS 106865, at *17-18 (N.D. Ala. Aug. 12, 2016), which entered summary judgment in favor of the defendant because the plaintiff could not show that, but for her FMLA leave, her employer would not have terminated her.  In doing so, the court declined to afford *Chevron* deference to the FMLA's implementing regulations at 29 C.F.R. § 825.220(c), which prohibit employers from using "the taking of FMLA leave as a negative factor in employment actions[.]"  *See Jones*, 2016 U.S. Dist. LEXIS 106865 at *13-14 (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984)).  However, Defendants do not provide any binding authority in support of the "but-for" requirement for FMLA retaliation claims, and "it seems that the Eleventh Circuit has yet to directly address the issue of but for cause with respect to FMLA retaliation."  *Kingsley v. Tellworks Communs., LLC*, Civil Action No. 1:15-CV-4419-TWT-JSA, 2017 U.S. Dist. LEXIS 92619, at *94 n.25 (N.D. Ga. May 24, 2017) (citing *Coleman v. Redmond Park Hosp., LLC*, 589 Fed. Appx. 436, 438 (11th Cir. 2014) (unpublished decision) (stating that "in the FMLA context,

53

neither the Supreme Court nor [the Eleventh Circuit] has required plaintiffs to prove that illegal retaliation was the 'but-for' cause of the adverse employment actions suffered"); *Jones*, 2016 U.S. Dist. LEXIS 106865 at *4), *adopted by* 2017 U.S. Dist. LEXIS 92616 (N.D. Ga. June 15, 2017); *Smith*, 273 F.3d at 1314 (requiring the plaintiff to show that "his past use of FMLA leave was a motivating factor").  Even so, with regard to retaliation claims, this Court has explained that "but for cause does not mean sole cause[,]" and has looked to the circumstances of a particular case to determine whether an employer's reason was justified.  *Id.*, 2017 U.S. Dist. LEXIS 92619 at *94).  Defendants therefore fail to persuade the Court that Plaintiff must prove that the *only* reason for his termination was his use of FMLA-qualifying leave.

Because triable issues of fact remain as to whether Plaintiff's termination was pretext for retaliation for taking FMLA-qualifying leave, the undersigned **RECOMMENDS** that Defendants' motion for summary judgment on Plaintiff's claim for retaliation under the FMLA (Count II) be **DENIED** and that Plaintiff's motion for summary judgment on the same claim be **DENIED**.[9]

---

[9] In addition to moving for summary judgment on his FMLA claims, Plaintiff also seeks summary judgment on separate elements of those claims, presumably requesting that the Court find separately on each of those elements.  (*See* Doc. 67 at 2-3).  As discussed above, as has been done in other cases, the Court has addressed the threshold issues of whether the Georgia Defendants were Plaintiff's employer and whether he is disabled under the ADA.  Those matters were fully briefed by the parties.  (*See generally* Doc. 67-1; Doc. 70; Doc. 73).  However, the

IV.   **Plaintiff's ADA Claims (Counts III-V)**

Defendants also seek summary judgment on Plaintiff's ADA claims.  "The ADA prohibits an employer from discriminating against a 'qualified individual on the basis of disability.' "  *McCarroll v. Somerby of Mobile, LLC*, 595 Fed. Appx. 897, 899 (11th Cir. 2014) (unpublished decision) (quoting 42 U.S.C. § 12112(a)). "To establish a *prima facie* case of disability-based discrimination under the ADA, a plaintiff must demonstrate that he (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of his disability." *Medearis v. CVS Pharm.*, No. 1:13-CV-1847-TWT-JFK, 2014 U.S. Dist. LEXIS 182769, at *16 (N.D. Ga. Sept. 29, 2014), *adopted by* 2015 U.S. Dist. LEXIS 30744 (N.D. Ga. Mar. 12, 2015).

For the purposes of their summary judgment motion, Defendants do not appear to dispute that Plaintiff was disabled under the Act.  (*See* Doc. 66-1 at 15). Nor do Defendants provide the Court with any reason to suggest that they dispute Plaintiff was a qualified individual.[10]  So, the critical question for Plaintiff's ADA claims is whether Defendant engaged in unlawful discriminatory conduct.

undersigned declines to further entertain arguments concerning summary judgment on particular separate elements of Plaintiff's FMLA claims, having found that those claims present triable issues of fact.

[10]  In a footnote, Defendants assert that Plaintiff cannot ask for "IMS Gear [to] excuse all of his performance issues because of his medical condition."  (Doc. 66-1 at 15 n.1).  To the extent this is a challenge to Plaintiff's ability to perform the essential functions of his job, the Court finds that this argument is insufficient to

## A. Failure To Accommodate (Count III)

Turning next to Plaintiff's allegations of unlawful discrimination, Plaintiff's first allegation asserts that Defendants failed to provide Plaintiff with reasonable accommodations as the ADA requires. (Am. Compl. at ¶¶ 162-167). " 'An

---

establish that Plaintiff is not a qualified individual as a matter of law. *See Arnold*, 2009 U.S. Dist. LEXIS 119787, at *10-11 ("The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.") (citing *Herzog*, 193 F.3d at 1246). Moreover, their assertion mischaracterizes Plaintiff's deposition testimony, which in actuality stated the following:

> Q   So when you were terminated in January of 2017 from employment, do you think they should have excused any performance issues in January because of your medical condition?
> A   I would have. If I tell Mr. Corbin explicitly in email that I can't concentrate because I'm dehydrated, that I don't understand and I can't do that, it's caused by medical condition, and I believe that should be taken into consideration when criticizing me a week later about not doing this work properly.

(Hein Dep. at 137:24-138:9). In his response, Plaintiff stated that he was able to perform the essential functions of his position with the accommodation that "he be excused for being unable to work while he was debilitated by his disability from January 18-24th" in order to seek medical treatment and ameliorate his colitis flare-up. (Doc. 71 at 16).

Accordingly, Defendants have not carried their burden to show that Plaintiff would not be able to perform the essential functions of his position with an accommodation, such that he would not be considered a qualified individual under the Act. *See Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) (finding that a "leave of absence might be reasonable in some cases"); *cf. Billups v. Emerald Coast Utils. Auth.*, No. 17-10391, 2017 U.S. App. LEXIS 21199, at *12 (11th Cir. Oct. 26, 2017) (unpublished decision) (finding that the plaintiff's requested accommodation of leave of absence was unreasonable because it "was essentially an open-ended request for sufficient time to ameliorate his conditions following the surgery.").

56

employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide reasonable accommodations for the disability—unless doing so would impose undue hardship on the employer.' " *McCarroll*, 595 Fed. Appx. at 899 (quoting *Lucas v. W.W. Grainger*, 257 F.3d 1249, 1255 (11th Cir. 2001)); *see also* 42 U.S.C. § 12112(b)(5)(A).   And "an employer is not required to provide an employee with 'the maximum accommodation or every conceivable accommodation possible.' "  *Id.* (quoting *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1285 (11th Cir. 1997)).   "The accommodation must also be reasonable based on the specific circumstances of the employer-employee relationship at issue."  *Id.*   However, the "employer's duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made."  *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).

    As Plaintiff points out in his response, Defendants do not appear to move for summary judgment on Plaintiff's failure to accommodate claim, instead addressing only Plaintiff's discriminatory termination and retaliation claims brought under the ADA.  (*See generally* Doc. 66-1 at 14-21).  For the first time in their reply brief, Defendants appear to make a brief argument in support of summary judgment on this claim.  (*See* Doc. 72 at 1-2).  However, "it is improper to raise new arguments in a reply brief or to recast a motion as something else in the movant's final

briefing opportunity, after it is too late for the nonmovant to respond." *Fisher v. Ciba Specialty Chems. Corp.*, Civil Action 03-0566-WS-B, 2007 U.S. Dist. LEXIS 76174, at *39 (S.D. Ala. Oct. 11, 2007) (declining to consider the defendants' argument that the plaintiff's claims should be dismissed on reply where "[t]his argument is nowhere to be found in the underlying Motion for Summary Judgment and supporting brief"), *adopted by* 2008 U.S. Dist. LEXIS 40108 (S.D. Ala. May 16, 2008); *see also United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir. 1984) ("Arguments raised for the first time in a reply brief are not properly before the reviewing court."); *Bagwell v Peachtree Doors and Windows, Inc.*, No. 2:08–CV–191–RWS–SSC, 2011 U.S. Dist. LEXIS 42262, at *55-56, n. 23 (N.D. Ga. Feb. 8, 2011) (declining to consider arguments supporting a motion for summary judgment that were made for the first time in the movant's reply brief), *adopted by* 2011 U.S. Dist. LEXIS 42259 (N.D. Ga. Apr. 19, 2011); *Mercado v. City of Orlando*, 323 F. Supp. 2d 1266, 1271 (M.D. Fla. 2002) ("By neglecting any mention of these claims in their motion for summary judgment, Defendants failed to meet their burden at summary judgment[.]").

Because Defendants' argument regarding Plaintiff's failure to accommodate claim are not properly before the Court, the undersigned cannot recommend summary judgment be granted to Defendants on that claim.

### B. Discriminatory Termination (Count IV)

Plaintiff's Amended Complaint alleges that Defendants terminated him because of his disability in violation of the ADA.  (Am. Compl. at ¶ 177; Doc. 71 at 16).  The ADA makes it unlawful to discriminate against a qualified individual "on the basis of disability in regard to . . . terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Though a wrongful discharge claim under the ADA is "separate and distinct" from a failure to accommodate claim, *Thompson v. City of Seminole City Council*, Case No. 8:05-1316-T-24TGW, 2007 U.S. Dist. LEXIS 71372, at \*25, n.9 (M.D. Fla. Sept. 26, 2007), "the *prima facie* elements of a wrongful termination discrimination claim are identical to those set forth above with regard to general disability discrimination claims[,]" *Rodriguez v. Fulton Cnty.*, Civil Action No. 1:06-CV-01392-MHS-LTW, 2008 U.S. Dist. LEXIS 126479, at \*37, n.10 (N.D. Ga. Jan. 9, 2008).  In addition to establishing that he was disabled and a qualified individual, he must also allege facts demonstrating that his discharge was based on his disability.  *See Collins v. Fulton Cnty. Sch. Dist.*, Civil Action No. 1:12-CV-1299-ODE-JSA, 2012 U.S. Dist. LEXIS 187392, at \*43 (N.D. Ga. Dec. 26, 2012).  In other words, " 'a plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability.' " *Jones v. Aaron's, Inc.*, Civil Action No. 1:15-CV-1686-RWS-JSA, 2017 U.S. Dist. LEXIS 211529, at \*79 (N.D. Ga. Jan. 31, 2017) (quoting *Savage v. Secure First*

*Credit Union*, 107 F. Supp. 3d 1212, 1217 (N.D. Ala. 2015)), *adopted by* 2017 U.S. Dist. LEXIS 211494 (N.D. Ga. Sept. 28, 2017).  Finally, "[t]he plaintiff is not required to establish that his disability was the sole basis for his discrimination, but need only show that his disability was a determinative factor." *Andrews v. City of Hartford*, 700 Fed. Appx. 924, 926 (11th Cir. 2017) (unpublished decision) (citing *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999)).

Defendants argue that Plaintiff cannot prove, as a matter of law, that he was terminated because of his disability.  (Doc. 66-1 at 15).  In response, Plaintiff contends that Defendants' proffered reason for Plaintiff's termination— "unsatisfactory job performance"—was prextual, and asserts that his "primarily positive" job history, along with "the close nexus in time between . . . [his] requests for medical leave on January 17th and 19th" and his termination, provide "evidence sufficient to permit a reasonable factfinder to conclude that Plaintiff's alleged poor performance was not the real reason for his termination and that but for Plaintiff's disability . . . he would not have been fired."  (Doc. 71 at 16-19). Defendants' sole reply to Plaintiff's response is that they "had a non-discriminatory, non-retaliatory reason for [Plaintiff's] termination—poor job performance."  (Doc. 72 at 1).

The Court finds that Plaintiff has created a genuine issue of fact regarding whether Defendants terminated him on the basis of disability.  As with Plaintiff's

FMLA retaliation claim discussed above, "under the broadest reading of the facts," the temporal proximity between Plaintiff's return from medical leave and his termination—two days—goes far in establishing "evidence of pretext" under the *McDonnell Douglas* analysis. *Hurlbert*, 439 F.3d at 1298; *see also Vaughan*, 2014 U.S. Dist. LEXIS 141912 at *37 (finding that a "one-day period between Vaughan's return from FMLA leave and her termination" was evidence that [her employer]'s proffered reason for firing Vaughan was a pretext to mask its intent to discriminate"). Moreover, this evidence does not stand alone. Again, as discussed above, the record indicates that Corbin twice referred to Plaintiff's absence while on leave as a supporting reason for his decision to terminate Plaintiff because Plaintiff's work "fell on others." (*See* Doc. 66-11 at 2; Doc. 66-9 at 2). Based on these circumstances in combination, a reasonable jury could infer that Corbin "more likely than not" terminated Plaintiff because of his disability rather than because of his purportedly unsatisfactory performance. *Pleasant v. D & N Elec. Co.*, Civil Action File No. 1:11-CV-2748-TWT, 2013 U.S. Dist. LEXIS 46937, at *13 (N.D. Ga. Apr. 1, 2013).

The Court acknowledges that Corbin's email explaining his rationale for terminating Plaintiff includes other concerns with Plaintiff's job performance, but in light of the temporal proximity of the termination and Corbin's express inclusion of Plaintiff's medical leave in his termination rationale, "a reasonable

jury could infer that this laundry list of infractions was a bogus attempt, crafted sometime after [Plaintiff's medical leave], to set [Plaintiff] up for discharge." *Vaughn*, 2014 U.S. Dist. LEXIS 141912, at *38.  For example, Corbin's email includes a statement that "I have repeatedly asked [Plaintiff] to travel to Virginia to orient him to the plant and complete critical work there.  Several times, he has indicated that he is unable to go because of family reasons.  [Plaintiff] was aware of this travel requirement when taking the position."  (Doc. 66-9 at 2).  The record contains two documented occasions wherein Corbin requested that Plaintiff accompany him to Defendants' Virginia office.  On the first occasion, Plaintiff gave Corbin a month and a half notice that he would not be able to travel to Virginia because he and his wife had decided to move up their wedding date in Germany because his grandmother there was terminally ill.  (Doc. 68-10 at 12). Corbin testified that because of the "the nature of the request[,]" he did not did not feel it was appropriate to require Plaintiff to come to Virginia in light of those circumstances.   (Corbin Dep. at 190:8-191:15).   On the second documented occasion, Corbin sent on email on November 15, 2015, requesting that Plaintiff and another accountant accompany him to Virginia in two weeks, on November 30, and exploring whether either accountant had any conflicts with that date.  (Doc. 68-10 at 14).  Plaintiff had conflicts due to a previously-planned vacation and his wife's inability to look after their infant son because she was on medical leave.

(*Id.* at 13-14).  While Corbin clearly had difficulties with Plaintiff's inability to accompany him on that occasion, the Court does not find that a reasonable employer would be motivated to terminate an employee on that sole basis, especially in light of giving an employee only two weeks' notice to arrange travel plans, and because Plaintiff's second reason he could not travel could have arguably been FMLA-qualifying in that it required him to care for his spouse who was on medical leave herself.  *See* 29 U.S.C. § 2612(a)(1)(C).  Additionally, while it appears clear that Corbin himself would have preferred that Plaintiff accompany him to Defendants' Virginia office, Plaintiff disputes that his job required any travel, instead testifying to the fact that he disclosed to Corbin at his initial interview that "I'm not extremely flexible with traveling[,]" and that the only additional work time the two discussed was working late on Mondays and performing work in the evening hours from home.  (*See* Hein Dep. at 22:7-15). Plaintiff separately asserted in his declaration that, in his interview, Corbin told him no travel to Virginia would be required, (Doc. 71-2 at 2), a statement Corbin testified that he did not remember making.  (Corbin Dep. at 50:18-22).  Moreover, Plaintiff's job description, which Defendants attach to their motion, does not include any specific travel requirements.  (*See* Doc. 66-3 at 2).  When asked about the other times he had requested Plaintiff travel to Virginia, Corbin could not

specifically recall them.[11]  (*See* Corbin Dep. at 182:1-9).  Thus, a reasonable jury could find that this reason was a post-hoc justification for Plaintiff's termination.

In his email, Corbin also referenced several other deficiencies, which Plaintiff disputed as examples of miscommunication or lack of clarification from Corbin.  For instance, Corbin referenced "3 significant items" assigned to Plaintiff in November 2015 while Corbin was in Germany.  (*See* Doc. 66-9 at 2).  While Corbin's email stated that "[n]one were completed," (*id.*), Plaintiff testified that in his view, each task had been completed.  (Hein Dep. at 74:22-76:6).  Corbin's email also makes much of an assignment involving the company's exploration of transitioning to a self-insurer.  (Doc. 66-9 at 2).  Corbin stated that plaintiff "alienated himself by frustrating the rest of the team in his communication style and approach.  Because of this, I had to join the team late in the project . . . and help bring the decision to a successful outcome for the company."  (*Id.*).  And Corbin took issue with Plaintiff's pursuit of a health insurance broker license during this process.  (*Id.*).  However, Plaintiff stated that he obtained the license in order to enhance his expertise on the assignment.  (Doc. 71-2 at 56-57).  And the record demonstrates that CEO Gregory Vitek expressed congratulations at Plaintiff's acquisition of the license, along with satisfaction of Plaintiff's role on the team and praise of Plaintiff's "expertise."  (*See* Doc. 66-6 at 3).

---

[11] Plaintiff stated that he only remembered being asked to travel to Virginia on two occasions.  (Doc. 71-2 at ¶ 92).

Defendants cite several other alleged deficiencies in support of their legitimate reason for Plaintiff's termination.  Yet it is unclear from the record these additional reasons played a role in Corbin's decision-making contemporaneously with Plaintiff's termination since they do not appear in Corbin's termination email or his handwritten list of reasons.  But even after consideration of Defendants' explanations concerning these additional reasons, the Court finds that these additional issues do not alter the conclusion that an issue of fact exists as to whether Plaintiff's disability was a "determinative factor" in Corbin's decision to terminate him.  *Andrews*, 700 Fed. Appx. at 926.

First, while Defendants stress that Plaintiff was "demoted" from Assistant Director of Finance to Senior Accountant "because of his poor job performance[,]" (Def. SMF at ¶ 4), Plaintiff testified that this change was made in an effort to resolve tension in the accounting department, (*see* Hein Dep. at 55:4-56:11), and aside from a statement in Corbin's declaration to the contrary, Defendants point to no record evidence that Plaintiff's position was changed due to his performance. (*See* Corbin Dec. at ¶ 10).  To the contrary, the record indicates that Plaintiff received the same pay, and performed the same duties under the new title, which would seem to be inconsistent with a demotion.  (*See* Hein Dep. at 55:4-56:11). Moreover, Corbin gives no indication in his termination email that the facts

surrounding Plaintiff's change in position contributed to Plaintiff's allegedly unsatisfactory performance.  (*See* Doc. 66-9 at 2-3; Doc. 66-11 at 2-3).

Defendants also cite to Plaintiff's late arrivals or early departures from work. (Def. SMF at ¶¶ 14-16).  Though Plaintiff did appear to be late for work on certain occasions for reasons unrelated to his ulcerative colitis, (*see* Def. SMF ¶¶ 14-15; Doc. 68-2 at ¶ 21), a jury could reasonably find that Plaintiff's 2016 leave more likely motivated Corbin's decision to terminate him than a handful of late arrivals to work, especially in light of the lack of discipline on the matter, (*see* Hein Dep. at 54:22-55:3), Plaintiff's relatively minor infractions, (*see id.* at 54:7-8), and the lack of clarity as to how many tardy arrivals were attributed to Plaintiff's disability versus how many were attributed to non-disability related reasons.  (*See id.* at 54:19-55:25).  *See, e.g.*, *Corbin*, 2016 U.S. Dist. LEXIS 134159 at *32 (finding that a jury could likely conclude that the plaintiff's late arrivals were merely pretext for retaliation).

Defendants also argue on a performance evaluation that "Corbin gave him a 2.93 out of 5, and that the review contained several negative comments regarding his work, his initiative, ability to complete tasks on time, and leadership; but argues that a 2.93 out of 5 was actually an average rating."[12]   (Doc. 72 at 10).

---

[12] While Defendants attach a purportedly accurate copy of Plaintiff's 1-year performance evaluation form to their motion, (*see* Doc. 66-4), Plaintiff objects to the admissibility of that exhibit on grounds of authenticity because it was

However, Plaintiff testified that Corbin told him he had received a "good review. That's how he explained it to me." (Hein Dep. at 53:11-16; *see also* Doc. 71-2 at ¶ 22 ("Corbin told me that my review was good enough for me to receive my full bonus for 2015.")).   Moreover, if Plaintiff's evaluations were below average as Defendants suggest, it is unclear why he received the full amount of his bonus each year, along with "an extra bonus through the year for extraordinarily good work" (Hein Dep. at 17:5-8), especially in light of Corbin's testimony that Plaintiff's bonus was dependent on performance.   (Corbin Dep. at 69:21-24).   *See, e.g.*, *EEOC v. Town of Elkton*, Civil Action No.: ELH-10-2541, 2012 U.S. Dist. LEXIS 98193, at *7 (D. Md. July 13, 2012) (finding that evidence that plaintiff received "every raise for which he was eligible" was a contributing factor to finding of pretext).

In light of the foregoing, there is a genuine issue of fact as to whether the reasons Defendants provide in support of their characterization of Plaintiff's

---

incomplete and unsigned by Plaintiff.  (Doc. 71-3 at 13; Doc. 71-2 at ¶ 23).  On reply, Defendants do not respond to Plaintiff's objection.  (*See generally* Doc. 72). Therefore, the undersigned finds that Plaintiff has stated a "valid objection to the admissibility of the movant's fact," such that Defendants' copy of Plaintiff's 1-year performance review will not be considered for purposes of their motion.  *See* LR 56.1B(2); *see also Johnson v. Gwinnett Cnty. Sch. Dist.*, Civil Action No. 1:11-CV-00471-TWT-RGV, 2012 U.S. Dist. LEXIS 170526, at *71 n.48 (N.D. Ga. Oct. 17, 2012) (declining to consider employee's annual evaluation because it was not properly authenticated "and therefore cannot be considered in evaluating this summary judgment motion"), *adopted by* 2012 U.S. Dist. LEXIS 169094 (N.D. Ga. Nov. 28, 2012).

performance as "unsatisfactory" "might motivate a reasonable employer" to terminate its employee. *Rossi v. Fulton Cnty.*, Civil Action File No. 1:10-CV-4254-RWS-AJB, 2013 U.S. Dist. LEXIS 44781, at *34 (N.D. Ga. Feb. 13, 2013) (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265-66 (11th Cir. 2010)); *see also Young*, 2014 U.S. Dist. LEXIS 38084 at *21 ("Thus, considering the general nature of Defendant's evidence, Plaintiff's rebuttal evidence is sufficiently probative to raise a genuine question as to the credibility of Defendant's proffered reasons.").

In light of (1) the temporal connection between Plaintiff's return from medical leave and his termination, (2) Corbin's express inclusion of Plaintiff's absence during leave as a motivating reason for Plaintiff's termination, (3) the fact that Plaintiff was not terminated before returning from leave, and (4) the fact that "there is at least some evidence of weaknesses and inconsistencies in [Defendant]'s proffered reasons[,]" the undersigned finds that, construing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendants' reason for terminating Plaintiff is pretext for discrimination. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("We have held that a period as much as one month between the protected expression and the adverse action is not too protracted."); *see also Vaughan*, 2014 U.S. Dist. LEXIS 141312 at *44; *Young*, 2014 U.S. Dist. LEXIS 38084 at *23-24 (reasoning that "while temporal proximity

alone does not establish pretext, here there is other evidence contradicting Defendant that, taken together, raise a reasonable inference that" the plaintiff was terminated for taking leave to take care for his wife's disability under the ADA); *Perez*, 2013 U.S. Dist. LEXIS (finding that a decision-maker's communication regarding the plaintiff's termination that expressly referenced his permanent injury for which he was on medical leave "was evidence of pretext for discrimination and showed that [the] plaintiff's termination was more likely motivated by his disability").

Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment be **DENIED** as to Plaintiff's discriminatory termination claim under the ADA (Count IV).

### C. ADA Retaliation (Count V)

Plaintiff's final claim under the ADA is that Defendants retaliated against him by terminating him in response to his need to take medical leave. (Am. Compl. at ¶ 185). " 'The ADA [] provides that 'no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA].' " *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1287 (11th Cir. 1997) (quoting 42 U.S.C. § 12203(a)).

"The analysis for retaliation actions under the ADA is similar to the analysis required by *McDonnell Douglas* (and, by extension, the FMLA)." *Norman*, 191 F.

Supp. 2d at 1336 n.9.  " '[T]o successfully allege a prima facie retaliation claim under . . . the ADA, a plaintiff must show that (1) []he engaged in statutorily protected expression; (2) []he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.' " *Vaughan*, 2014 U.S. Dist. LEXIS 141912 at *34 (quoting *Weeks v. Harden*, 291 F.3d 1307, 1311 (11th Cir. 2002)).

> Defendants argue that they are entitled to summary judgment because
>
> Plaintiff has not identified any incident wherein he purportedly engaged in protected activity or complained of discrimination. . . . Additionally, Plaintiff's retaliation claims would fail for the same reason as his discrimination claims—Defendants have come forward with a non-retaliatory reason for his termination—poor job performance. . . . Those arguments need not be repeated.

(Doc. 66-1 at 20-21).   In response, Plaintiff argues that "Plaintiff engaged in protected activity by requesting that 'Defendants provide him with reasonable accommodations for his disability, including medical leave for episodic flare-ups.' " (Doc. 71 at 19 (quoting Am. Compl. at ¶ 183)).  Plaintiff also points to Corbin's email referencing Plaintiff's absence while on leave as a reason for his termination, as well as Chambers's testimony confirming the accuracy of Defendant's answer to Plaintiff's Amended Complaint, which stated that "Corbin criticized Plaintiff the day before his termination 'for not coming in the entire prior w[ee]k and missing the entire audit[.]' "  (Doc. 71 at 20 (quoting Chambers Dep. at 69:13-15)); *see also* Doc. 8 at ¶ 51).

70

As with Plaintiff's FMLA retaliation claim, the undersigned finds that Plaintiff has created a genuine issue of fact regarding whether Defendants terminated him in retaliation for taking a protected activity under the ADA.  First, contrary to Defendants' assertion that Plaintiff has provided no allegation of protected activity, Plaintiff specifically alleged that he sought medical leave to accommodate "episodic flare-ups of his disability."   (Am. Compl. at ¶ 183). Further, as discussed above, Plaintiff's correspondence with Corbin at least creates an issue of fact with regard to whether Plaintiff engaged in a protected activity by putting Defendants on notice that he required medical treatment for his colitis disability on January 17 and 18, 2016.  (*See* Docs. 67-5 at 1; 67-6 at 1); Plaintiff sent further emails communicating his need for medical leave on January 19, 2016, which culminated in an explicit assertion of his symptoms, their affect on his work, and his need to refrain from working for the remainder of the week under doctor's orders.  (*See* Docs. 67-8 at 1; 67-7 at 1).  The Eleventh Circuit has recognized that "a leave of absence can be a reasonable accommodation[.]"  *Wood*, 323 F.3d at 1313, and as such, request for medical leave to ameliorate the effects of a disability would certainly be protected from retaliation by the ADA.  *See Vaughan*, 2014 U.S. Dist. LEXIS 141912, at *35 n.10 (request for medical leave considered "statutorily protected activity" for purposes of ADA retaliation claim) (citing *Standard v. A.B.E.L. Servs.*, 16 F.3d 1318, 1333 (11th Cir. 1998)).

Having established that Plaintiff's request for FMLA-qualifying leave was also a statutorily-protected request for accommodation under the ADA, the Court reaches the same conclusion discussed above with regard to Plaintiff's FMLA retaliation claim—namely, that triable issues exist both as to whether Plaintiff's termination was causally related to his request to take medical leave and as to whether Defendants' proffered reason for terminating Plaintiff was pretextual. *See Myers v. Gwinnett Cnty.*, Civil Action File No. 1:16-cv-824-RWS-JKL, 2017 U.S. Dist. LEXIS 215371, at *40-43 (N.D. Ga. July 20, 2017) (finding that "the protected activity in which Myers engaged under the ADA and FMLA is the same: she requested that she be allowed to . . . take [] FMLA leave as an accommodation"); *see also Young*, 2014 U.S. Dist. LEXIS 38084 at *35 (applying the same reasoning to plaintiff's retaliation claims under the FMLA and the ADA); *Jerome v. Barcelo Crestline, Inc.*, Civil Action No. 1:07-CV-0447-WSD-LTW, 2009 U.S. Dist. LEXIS 134396, at *8 n.2 (N.D. Ga. Nov. 10, 2009) ("[T]he framework for adjudicating retaliation claims under . . . the ADA[] and the FMLA are basically the same.").

Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment be **DENIED** as to Plaintiff's retaliation claim under the ADA (Count V).

## V.   Plaintiff's COBRA and ERISA Information Claims (Counts VI and VII)

## A. Failure To Provide Benefits Information Under 29 U.S.C. § 1024(b)(4) (Count VI)

Plaintiff's Amended Complaint alleges that Defendants failed to provide Plaintiff with certain benefits information he requested in violation of 29 U.S.C. § 1024(b)(4), which requires an employer's benefits plan administrator to furnish copies of benefit plans, summaries, and other related information to beneficiaries upon written request. *Id.* (Am. Compl. at ¶¶ 204-207). This count appears to be included as a companion claim to Plaintiff's allegations that Defendants did not provide him with COBRA notification, addressed separately below. Defendants move for summary judgment on this claim for a number of reasons included in their supporting brief. (*See* Doc. 66-1 at 28-30). However, as Defendants point out on reply, Plaintiff's response does not address their arguments in support of summary judgment as to that claim. (Doc. 72 at 13; *see also* Doc. 71 at 22-25 (addressing Defendants' arguments in opposition to Plaintiff's COBRA claim, but omitting any argument relating to his ERISA claim under 29 U.S.C. § 1024(b)(4))). Consequently, the undersigned need not review the merits of Defendants' arguments in favor of summary judgment on that claim, as the Court deems it abandoned. *See Thomas v. Bed Bath & Beyond, Inc.*, 508 F. Supp. 2d 1264, 1285 (N.D. Ga. 2007) ("Having failed meaningfully to respond to Defendant's Motion for Summary Judgment on this claim, [Plaintiff] has abandoned it and [Defendant] is entitled to summary judgment.").

73

So, to the extent Plaintiff's allegations under § 1024(b)(4) form an independent claim for relief, it is **RECOMMENDED** that Defendants' motion for summary judgment on that claim be **GRANTED**.

### B. Failure To Provide Notice Of COBRA (Count VI)

Plaintiff also alleges a separate COBRA notification under his sixth count. (*See* Am. Compl. at ¶ 201). "Following an employee's termination, 29 U.S.C. § 1166(a)(4)(A) requires plan administrators to notify the former employee of their right to receive continuation coverage." *Scott v. Suncoast Bev. Sales, Ltd*, 295 F.3d 1223, 1231 (11th Cir. 2002). "The notice must be sufficient to permit the discharged employee to make an informed decision whether to elect coverage." *Id.* (citing *Meadows v. Cagle's, Inc.*, 954 F.2d 686, 692 (11th Cir. 1992)). The plan administrator must "use measures reasonably calculated to ensure actual receipt of the material by plan participants." 29 C.F.R. § 2520.104b-1(b)(1).

Defendants argue that they are entitled to summary judgment on this claim because they notified Discovery Benefits of Plaintiff's termination, and a COBRA notice was sent to Plaintiff's address on file by first-class mail. (Doc. 66-1 at 27-28). According to Defendants, "[t]here is no evidence to rebut this." (*Id*. at 28; *see also* Doc. 72 ("The only admissible evidence cited by Plaintiff is that he never received COBRA notification. None of the testimony cited by Plaintiff supports his contention that the COBRA notification(s) were not mailed.")). In support of

their argument, Defendants cite to *DeBene v. BayCare Health Sys.*, Case No. 8:15-cv-386, 2016 U.S. Dist. LEXIS 62303, at *23 (M.D. Fla. May 11, 2016), which held that "a former employee's claim that he did nto receive the notice is insufficient, standing alone, to support a COBRA notice claim."  Plaintiffs respond by arguing that Defendants have not provided any evidence, apart from "Chamber's [sic] unsubstantiated declaration," that they complied with the notice requirement as a matter of law.  (Doc. 71 at 24).

The undersigned finds that Plaintiff has created a genuine issue of fact with regard to whether Defendants sent him a COBRA notification.  Defendants' reliance on *DeBene* is misplaced.  In *DeBene*, BayCare, the plaintiff's former employer, contracted with a benefits system called Benefits Concepts, which provided COBRA election notices to BayCare's former employees.  2016 U.S. Dist. LEXIS 62303 at *12.  Just as Plaintiff does here, DeBene alleged that he never received his COBRA notice.  However, on summary judgment, the district court found that BayCare "provided sufficient undisputed record evidence that satisfies its burden of demonstrating that it mailed DeBene a COBRA letter."  *Id.* at *23.  That evidence included

> A copy of the July 23, 2014 COBRA letter itself, as well as a copy of the Letters Sent Report that was generated by [the third party benefits company], which shows that [it] sent DeBene and his spouse a COBRA election notice on July 23, 2014.  Additionally, WageWorks' corporate representative, Kristin Saunders, testified about Benefit Concepts' procedures of mailing COBRA notices and how they were

75

> followed with respect to DeBene's COBRA notification.  BayCare
> also produced evidence showing that other employees who were
> mailed notices on the same day as DeBene successfully elected their
> COBRA coverage.

*Id.* at *24.  Additionally, the court noted that "district courts have held that such

business records coupled with witness testimony are sufficient to meet an

employer's COBRA notice obligation."  *Id.* (citing *Vangas v. Montefiore Med.*

*Ctr.*, 11 Civ. 6722, 2014 U.S. Dist. LEXIS 156593, at *9 (S.D.N.Y. Nov. 5, 2014);

*Roberts v. National Health Corp.*, 963 F. Supp. 512, 514 (D.S.C. 1997) (granting

summary judgment to the employer where it produced a "COBRA report" that

showed when the actual notification letter was mailed to the plaintiff)).  The

Eleventh Circuit affirmed, citing to the production of the actual notification letter,

the report from Benefits Concepts "showing that the letter was sent on [the

required] date[,]" and BayCare's evidence showing other former employees'

receipt of the letters sent on that date.  *Debene v. BayCare Health Sys.*, 688 Fed.

Appx. 831, 839-840 (11th Cir. 2017) (unpublished decision) ("In light of this

undisputed evidence, we conclude that BayCare has met its obligations under

COBRA.") (citing 29 C.F.R. § 2520.104b-1(b)(1)).

Here, unlike in *DeBene*, Defendant has not submitted a copy of the actual

COBRA notification letter purportedly sent to Plaintiff.  In fact, Defendants' only

evidence that they sent Plaintiff a COBRA notification is Chambers's declaration

that Defendants notified Discovery Benefits of Plaintiff's termination, and that a

76

COBRA letter was sent two days later to Plaintiff's address by first-class mail. (*See* Doc. 66-12 at ¶¶ 68-71).   Additionally, unlike BayCare in *DeBene*, Defendants here did not produce any records from Discovery Benefits tending to show the letter was sent, nor did they provide any testimony from the person apparently responsible for overseeing the COBRA notification process.   (*See* Chambers Dep. at 79:2-4).

Not only is Defendants' presentation lacking, Plaintiff has submitted a copy of a screen shot from Discovery Benefits' notification procedures page that contained a blank space next to the prompt "Specific Rights Processed Date,"[13] Chambers testified that Plaintiff's print-out "appears to be a document that I believe Nicole Shriver produced for counsel indicating the process of COBRA notification for Mr. Hein[.]" (Chambers Dep. at 78:21-23).   Plaintiff also produced a demand letter from 2014 evidencing that another of Defendants' former employees previously alleged a claim for not receiving a COBRA notification.[14]

---

[13] As an exhibit to his statement of additional material facts, Plaintiff also attached documents subpoenaed from Discovery Benefits, which included a guide to the Discovery Benefits portal.   (*See* Doc. 71-1 at 13).   That document appears to indicate that the space next to the prompt "Specific Rights Processed Date" in the discovery portal should reflect "The date the original COBRA Specific Rights Notice was mailed to the Q[ualified] B[enificiary]." (*Id.*).

[14] Defendants object to the admissibility of Plaintiff's exhibits with the blanket statement that "The evidence cited is not admissible for and does not support the facts stated" without any further explanation.   (*See* Doc. 75 at ¶¶ 20-22).   This blanket objection is insufficient to provide grounds of inadmissibility for purposes of LR 56.1B(3).   Later, in their reply brief, Defendants protest that "[t]he evidence

The Court finds that Defendants have not produced enough "undisputed record evidence that satisfies [their] burden of demonstrating that [they] mailed [Plaintiff] a COBRA letter." *DeBene*, 2016 U.S. Dist. LEXIS at *23. As a result, viewing the facts in his favor as the non-movant, the undersigned finds that Plaintiff has adduced sufficient evidence to create a triable issue of fact with regard to whether Defendants sent him COBRA notification as required by 29 U.S.C. § 1166(a)(4)(A).

Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment on Plaintiff's COBRA notification claim be **DENIED**.

### C. Interference With Receipt Of Benefits (Count VII)

Plaintiff's last claim is for interference with receipt of benefits in violation of section 510 of ERISA. (*See* Am. Compl. at ¶¶ 210-223). Under that section, it is unlawful to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary [of an employee benefit plan] . . . for the purpose of interfering with the attainment of any right to which such participant may become

---

cited by Plaintiff, print outs and documents from third parties, is inadmissible hearsay and does not provide evidence that the COBRA notifications were never mailed." (Doc. 72 at 12). In any case, it appears that Plaintiff's exhibits could "reduced to admissible form as [a] record[] of a regularly conducted business activity." *Saunders*, 2008 U.S. Dist. LEXIS 125526 at *11-12. The Court will therefore consider those exhibits as part of the record for purposes of both summary judgment motions.

entitled under the plan[.]"  29 U.S.C. § 1140.  In order to establish a prima facie

case of violation of section 510, a plaintiff must establish

> (1) that he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination. . . . To satisfy the last element the plaintiff does not have to prove discriminatory intent but must introduce evidence that suggests interference with ERISA rights was a motivating factor.

*Gitlitz v. Compagnie Nationale Air Fr.*, 129 F.3d 554, 559 (11th Cir. 1997)

(quoting *Clark v. Coats & Clark*, 990 F.2d 1223-24 (11th Cir. 1993)).  Further,

proof that interference with ERISA rights was a motivating factor "can be met

either by showing direct proof of discrimination or by satisfying the scheme for

circumstantial evidence established by *McDonnell Douglas*[.]"  *Id.*, 129 F.3d at

558 (quoting *Clark*, 990 F.2d at 1223) (additional citations omitted).

Defendants do not to dispute that Plaintiff is (1) covered by ERISA and (2)

qualified for the position.  (*See* Doc. 66-1 at 30-31).  Instead, Defendants argue the

following: "Absent any evidence or factual allegation from Plaintiff connecting

any protected activity under ERISA with his termination, Defendant will not

address this issue in detail.  However, the same non-discriminatory, non-protected

reasons for Plaintiff's termination discussed above would apply here."  (Doc. 66-1

at 31).  Plaintiff contends that circumstantial evidence exists that suggesting that

interference with his health insurance was a motivating factor in Defendants'

decision to terminate him.  (Doc. 71 at 21-22).  On reply, Defendants challenge

Plaintiff's circumstantial evidence as insufficient to establish an inference of discriminatory intent.  (Doc. 72 at 14).

Because Plaintiff has not directed the Court toward any specific evidence that would show that he was terminated for a reason prohibited by ERISA "without inference or presumption," Plaintiff fails to establish direct evidence of a § 510 ERISA violation.  *Rogers v. I D Design, Inc.*, No. 1:06-CV-2101-CAP-WEJ, 2009 U.S. Dist. LEXIS 135204, at *20 (N.D. Ga. Mar. 6, 2009).  However, the undersigned finds that, viewing the facts in the light most favorable to Plaintiff, he has presented sufficient circumstantial evidence to create a genuine issue of fact concerning whether his termination was connected to a discriminatory motive to interfere with his benefits.  In support of this finding, the Court notes two important pieces of circumstantial evidence highlighted in Plaintiff's response. First, Plaintiff testified that his condition, ulcerative colitis, "was on the list of Defendants['] 'high dollar value' medical claims for prior years[.]"  (Doc. 71 at 22).  On reply, Defendants assert that "Plaintiff also was NOT on a 'high dollar value' list of medical claims."  (Doc. 72 at 14).  However, in support of their argument, Defendants simply refer to Plaintiff's deposition testimony in support of his original argument.  (*Id.* (citing Hein Dep. at 138:24-139:22)).  Plaintiff's assertion that ulcerative colitis was a "high dollar" claim is therefore unrebutted and could support a finding that his termination was partially based on Defendants'

ability to save money on health costs by preventing him from participating in group health coverage, especially in light of Vitek's alleged comments in support of halting healthcare for terminally ill patients otherwise eligible for coverage. *See Stabile v. Allegheny Ludlum, LLC*, Civil Action no. 12-168, 2012 U.S. Dist. LEXIS 126703, at *31 (W.D. Pa. Sept. 6, 2012) (reasoning that the "significant medical expenses" incurred by the plaintiff and his children, combined with the allegation of a "policy and practice of identifying and discriminating against eligible employees with relatively high medical costs in order to save money" were sufficient to create a triable issue on the plaintiff's § 510 claim).

The temporal proximity between Plaintiff's increased use of medical benefits to treat his January 2016 flare-up and his termination provides further circumstantial evidence in support of his § 510 claim. Undisputedly, Corbin knew of Plaintiff's severe colitis flare-up in January 2016, his pursuit of medical treatment and medications during that period, and his use of medical leave, and Corbin terminated him two days after he returned. (Def. SMF at ¶ 58; Doc. 67-7 at 1). The "close temporal proximity" analysis applied to Plaintiff's other claims above is similarly persuasive circumstantial evidence to a prima facie claim of unlawful discharge under ERISA, especially combined with Plaintiff's other factual assertions with regard to the expense of his health condition and Vitek's alleged comments, such that a reasonable jury could find that Plaintiff's increased

use of benefits was a "motivating factor" in Corbin's termination decision. *Gitlitz*, 129 F.3d at 559; *see also Kara v. Fla. Pub. Utils. Co.*, Case No. 3:06-cv-572, 2008 U.S. Dist. LEXIS 8776, at *22 (M.D. Fla. Feb. 6, 2008) (finding that, *inter alia*, temporal proximity between the plaintiff's termination and a major medical treatment was sufficient to survive summary judgment); *Reynolds v. IBM*, 320 F. Supp. 2d 1290, 1299 (M.D. Fla. 2004) (in analyzing a § 510 claim, noting that " 'close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection' ") (quoting *Brungart*, 231 F.3d at 799); *cf. Corning v. LodgeNet Interactive Corp.*, 896 F. Supp. 2d 1138, 1156 (M.D. Fla. Sept. 14, 2012) (finding that temporal proximity alone was insufficient to satisfy the plaintiff's § 510 claim where there was "no suggestion that [the plaintiff's] use of benefits increased just prior to his termination").

Finally, though Defendants' rely on "the same non-discriminatory, non-protected reasons for Plaintiff's termination" in arguing against Plaintiff's § 510 claim, the Court finds that Plaintiff's circumstantial evidence presented above also creates an issue of fact on whether Defendants' proffered reasons were a pretext for unlawful discriminatory intent under ERISA. *See Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998) ("[T]he showing of pretext need not necessarily involve further evidence; the evidence in a prima facie case might be

strong enough to also show pretext."); *see also Wolchok v. Law Offices of Gary Martin Hays & Assocs., P.C.*, Civil Action No. 1:07-CV-0765-CC, 2008 U.S. Dist. LEXIS 126115, at *11-12 (N.D. Ga. Aug. 27, 2008) ("Close temporal proximity . . . is insufficient to raise a genuine issue of material fact concerning pretext, but the evidence may be considered with other evidence[.]"); *McMullen v. Charter Schs. United States, Inc.*, Case No. 09-61578-CIV, 2011 U.S. Dist. LEXIS 162975, at *51 (S.D. Fla. Feb. 18, 2011) (finding that circumstantial evidence used in persuading the Court of the plaintiff's prima facie § 510 claim also created an issue of fact with regard to pretext).  The Court further notes that Plaintiff's evidence for suggesting that Defendants' proffered reason for his termination was "unworthy of credence," which was presented in support of his ADA unlawful discharge claim are similarly persuasive in showing pretext under his § 510 claim.  *See Combs*, 106 F.3d at 1538 (instructing that summary judgment is inappropriate where "a reasonable factfinder could find [the defendant's proffered legitimate reasons] unworthy of credence").

Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment as to Plaintiff's § 510 claim (Count VII) be **DENIED**.

## VI.   Attorney's Fees And Costs Under O.C.G.A. § 13-6-11

Finally, in their motion, Defendants assert that Plaintiff's May 2017 motion to amend the Amended Complaint by deleting his breach of contract claim (Doc.

63) also deleted his claim for attorney's fees and costs (Count IX).  (*See* Doc. 66-1 at 31).  Plaintiff's response does not address his claim for attorney's fees under O.C.G.A § 13-6-11.  (*See generally* Doc. 71).  Where a plaintiff fails to respond to an opposing party's argument that the claim should be dismissed, he may be considered to have abandoned the claim.  *See Agan v. Vaughn*, 119 F.3d 1538, 1541 (11th Cir. 1997) (declining to address claim abandoned by petitioner), *cert. denied.*, 523 U.S. 1023 (1998); *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (deeming claim abandoned where argument was not presented in initial response to motion for summary judgment); *see also Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) (Non-movant's failure to address a challenged claim on summary judgment warranted dismissal of that claim).  The undersigned therefore deems Plaintiff's claim for attorney's fees abandoned.

Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment on Plaintiff's claim for attorney's fees under O.C.G.A. § 13-6-11 (Count IX) be **GRANTED**.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Plaintiff's motion for partial summary judgment (Doc. 67) be **GRANTED** as to whether the Georgia Defendants were Plaintiff's single employer for purposes of the FMLA and ADA,

**GRANTED** as to whether Plaintiff has a disability for purposes of the ADA, but **DENIED** on the claims for interference (Count I) and retaliation (Count II) under the FMLA.

It is further **RECOMMENDED** that Defendants' motion (Doc. 66) be **GRANTED** as to Plaintiff's unpleaded employer-notice claims under the FMLA, the ERISA notice claim (Count VI), and any claim under O.C.G.A. § 13-6-11 (Count IX), and that it be **DENIED** as to the other FMLA claims (Counts I and II), ADA claims (Counts III-V), COBRA notification claim (Count VI), and the ERISA § 510 claim (Count VII).

**IT IS SO REPORTED AND RECOMMENDED** this 31st day of January, 2018.

/s/ J. Clay Fuller
J. Clay Fuller
United States Magistrate Judge

85